781 F.2d 1421
 12 Soc.Sec.Rep.Ser. 180, Medicare&Medicaid Gu 35,116,
Medicare&Medicaid Gu 35,451
Stanley CUBANSKI, Director, Department of Health Services
State of California, Petitioner,
and
Donald A. Barrier, Alan Bierman, Lola Bierman, James Jones,
Ronald Kwiek, Petitioners-Intervenors,
v.
Margaret HECKLER, Secretary, Department of Health and Human
Services, United States of America, Respondent.
 No. 85-7123.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 14, 1985.
Decided Feb. 7, 1986.
As Amended March 6, 1986.
 
 Willie M.J. Curtis, Ralph M. Johnson, San Francisco, Cal., Evelyn R. Frank, Legal Aid Soc. of Alameda Cty., Oakland, Cal., for petitioner.
 Brenda F. Kohn, Cade L. Morrow, San Francisco, Cal., for respondent.
 Petition for Review of a Decision of the Department of Health and Human Services.
 Before DUNIWAY and CHOY Senior Circuit Judges, and FARRIS, Circuit Judge.
 DUNIWAY, Senior Circuit Judge:
 
 
 1
 The California legislature increased the amount of income a medically needy adult couple can keep for non-medical needs and still be eligible to receive Medicaid. The State submitted this amendment of its Medicaid plan to Health and Human Services (HHS) Secretary Heckler, who disapproved it. The California Department of Health Services (the State) and the Legal Aid Society of Alameda County (Intervenors) challenge the Secretary's final determination. We reverse.
 
 
 2
 I. Facts.
 
 
 3
 A. The Medicaid Program.
 
 
 4
 Title XIX of the Social Security Act, 42 U.S.C. Sec. 1396 et seq., was established "for the purpose of providing federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons." Harris v. McRae, 1980, 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784. In order to participate in the program, States must submit a plan to the Secretary, who shall approve any plan which fulfills the requirements set out in 42 U.S.C. Sec. 1396a(a). 42 U.S.C. Sec. 1396a(b). Upon such approval, the State becomes entitled to Federal Financial Participation in state expenditures made in accordance with that plan. 42 U.S.C. Sec. 1396b.
 
 
 5
 A State Medicaid Program must provide medical assistance to so-called categorically needy recipients of welfare benefits. 42 U.S.C. Sec. 1396a(a)(10)(A). In addition, states may provide Medicaid coverage to so-called medically needy aged, blind and disabled people and families whose income is too high to allow them to qualify for welfare benefits. 42 U.S.C. Sec. 1396a(a)(10)(C).
 
 
 6
 Each state Medicaid plan must set an income standard for medically needy recipients in accordance with Federal requirements. This "medically needy income level" (MNIL) represents the amount of income an individual or family may keep for non-medical needs and still be eligible to receive Medicaid.
 
 
 7
 B. Medi-Cal Revisions.
 
 
 8
 The California Medicaid plan (Medi-Cal) includes medically needy recipients. Hearings conducted by the California legislature in early 1983 suggested that aged and disabled medically needy recipients were unable to afford necessary medical care, as well as non-medical necessities, under current income standards. In response to findings that elderly and disabled adults incur greater living expenses than families with dependent children, the California legislature amended its Medicaid plan to increase the MNIL for a family of two medically needy adults to 133 1/3 percent of the highest amount that would ordinarily be paid to a family of three persons without any income or resources under its aid to families with dependent children (AFDC) plan. Statutes of 1983, Ch. 323, Sec. 124.6(c) (codified at Cal.Welfare and Inst.Code Sec. 14005.12(c)). The effect of this amendment was to increase the MNIL for adult couples from $544 to $709 per month. Ch. 323 further directed the State Director of Health Services to adopt regulations to implement the amended provisions as emergency regulations "necessary for the immediate preservation of the public peace, health and safety, or general welfare," Section 124.7(d), and provided that the amended provision would be inapplicable to the extent that it conflicts with federal law, Section 124.7(a). The State began implementing these revisions on November 1, 1983, effective July 1, 1983.
 
 
 9
 C. The Secretary's Determination.
 
 
 10
 The State submitted State Plan Amendment (SPA) 83-14 to its Title XIX Medicaid Plan, reflecting its revised adult couple MNIL. On December 19, 1983, the Administrator of the Health Care Financing Administration (HCFA) notified the State that SPA 83-14 was disapproved on the ground that it violated Section 1903(f) of the Social Security Act, 42 U.S.C. Sec. 1396b(f).
 
 
 11
 Pursuant to 42 U.S.C. Sec. 1316(a), the State petitioned the Secretary to reconsider HFCA's disapproval of SPA 83-14. On November 30, 1984, after a hearing was held, the Hearing Officer issued a Recommended Decision that the HCFA decision should be affirmed. On January 30, 1985, the HCFA Administrator, pursuant to delegated authority from the Secretary, issued her final decision affirming her initial disapproval of the plan amendment.
 
 
 12
 The State filed a timely petition for review by this court of the Secretary's final decision pursuant to 42 U.S.C. Sec. 1316(a)(3). On April 1, 1985, this court granted a Motion to Intervene filed by the Legal Aid Society of Alameda County on behalf of several medically needy adult couples.
 
 
 13
 II. Standard of Review.
 
 
 14
 In reviewing the Secretary's disapproval of SPA 83-14, this court must decide all relevant questions of law and interpret the statutory provisions at issue. 5 U.S.C. Sec. 706. The Secretary's decision must be set aside if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," Sec. 706(2)(A); "in excess of statutory ... authority," Sec. 706(2)(C); or "without observance of procedure required by law," Sec. 706(2)(D). The Secretary's interpretation of the Medicaid Act is entitled to deference, FEC v. Democratic Senatorial Campaign Committee, 1981, 454 U.S. 27, 31-32, 102 S.Ct. 38, 41-42, 70 L.Ed.2d 23. However, "the courts are the final authorities on issues of statutory construction. They must reject administrative constructions of the statute ... that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement." Id. at 32, 102 S.Ct. at 42. See also Livermore v. Heckler, 9 Cir., 1984, 743 F.2d 1396, 1404-1405.
 
 
 15
 III. Discussion.
 
 
 16
 A. Section 1903(f) and ROM Sec. 2572-D.
 
 
 17
 Section 1903(f) of the Social Security Act, 42 U.S.C. Sec. 1396b(f), states the limitation on Federal participation in medical assistance:
 
 
 18
 (1)(A) Except as provided in paragraph (4), payment under the preceding provisions of this section shall not be made with respect to any amount expended as medical assistance in a calendar quarter, in any State, for any member of a family the annual income of which exceeds the applicable income limitation determined under this paragraph.
 
 
 19
 (B)(i) Except as provided in clause (ii) of this subparagraph, the applicable income limitation with respect to any family is the amount determined, in accordance with standards prescribed by the Secretary, to be equivalent to 133 1/3 percent of the highest amount which would ordinarily be paid to a family of the same size without any income or resources, in the form of money payments, under the plan of the State approved under part A of subchapter IV of this chapter [AFDC].
 
 
 20
 (emphasis added.)
 
 
 21
 This rule is further elaborated in the regulations implementing the statute:
 
 
 22
 Medically needy income standards: General requirements.
 
 
 23
 To determine eligibility of medically needy individuals, a Medicaid agency must use an income standard under this subpart that is--
 
 
 24
 (a) Based on family size;
 
 
 25
 (b) Uniform for all individuals in a covered group;
 
 
 26
 (c) For FFP [Federal Financial Participation] purposes, not in excess of 133 1/3 percent of the highest money payment that ordinarily would be made in the State AFDC program to an individual or a family of comparable size; and
 
 
 27
 (d) Reasonable.
 
 
 28
 42 C.F.R. Sec. 435.811 (1984).
 
 
 29
 Medically needy.
 
 
 30
 (a) FFP is available in expenditures for services provided to medically needy recipients whose annual income ... does not exceed the following amounts ...
 
 
 31
 (1) For couples and families of two or more, 133 1/3 percent of the highest money payment that would ordinarily be made under the State's AFDC plan to a family of the same size without income and resources.
 
 
 32
 42 C.F.R. Sec. 435.1007.
 
 
 33
 The Administrator disapproved SPA 83-14 on the grounds that it violated the "plain and unequivocal" language of Section 1903(f) and the above regulations. However, the Administrator's narrow reading of the statute fails to recognize sufficiently the substantive component of the MNIL determination. Section 1903(f) does not simply fix the applicable MNIL at 133 1/3 percent of the highest amount ordinarily paid to a family of the same size without income or resources under a State's AFDC plan. The section provides that the applicable MNIL is "the amount determined, in accordance with standards prescribed by the Secretary, to be equivalent to " 133 1/3 percent of the highest amount ordinarily paid to a family of the same size under AFDC. 42 U.S.C. Sec. 1396b(f)(1)(B)(i) (emphasis added.) Had Congress intended that MNILs be determined purely as a mathematical procedure, it would not have included the above clause, which requires the Secretary to prescribe standards for determining an "equivalent" MNIL in relation to the comparative needs of medically needy and AFDC families of the same size. See Batterton v. Francis, 1977, 432 U.S. 416, 428, 97 S.Ct. 2399, 2407, 53 L.Ed.2d 448: "Congress itself must have appreciated that the meaning of the statutory term was not self-evident, or it would not have given the Secretary the power to prescribe standards."
 
 
 34
 In response to a state's request "for a clarification of policy" regarding the establishment of MNILs under Section 1903(f), HHS promulgated Regional Office Manual (ROM) Sec. 2572-D in June 1979. CCH Medicaid and Medicare Guide, p 30,392 at 9512-13. This ROM provision set out HHS policy as to the specific problem addressed by the California plan amendment at issue here: the comparable income levels of medically needy adults and those of children in families receiving assistance under AFDC. Citing documentation that the maintenance needs of these groups are not equivalent, ROM Sec. 2572-D states that "the States may set a separate medically needy income level for two adults which would be established between 133 1/3 percent of the AFDC payment level for one person and 133 1/3 percent of the AFDC payment level for a family of three persons." HHS cites Montana as an example of a state which properly established an adult couple MNIL above the state AFDC level for a family of two. The ROM section concludes:
 
 
 35
 In view of the greater maintenance needs of an adult as opposed to a child, ... and in the interest of comparable treatment of persons with similar needs, the States should have the option of establishing separate medically needy income levels for a two-person family consisting of one adult and one child and for a two-person family composed of two adults.
 
 
 36
 In disapproving SPA 83-14, the Administrator rejected the State's reliance on ROM Sec. 2572-D on the ground that "[t]he ROM section is patently contrary to the statute and was, therefore, invalid from its origination." This conclusion is based upon the improperly narrow construction of Section 1903(f) noted above. ROM Sec. 2572-D is entirely consistent with the statutory requirement that the Secretary may promulgate standards for determining "equivalent" income limitations.
 
 
 37
 The Secretary also argues that the amendment is invalid under the ROM language allowing states to adopt an MNIL "between" 133 1/3 percent of the AFDC payment level for one person and 133 1/3 percent of the AFDC payment level for a family of three persons. Under the Secretary's view, SPA 83-14 would presumably have fulfilled the ROM criteria if California had set the adult couple MNIL at "one dollar less than" the maximum set out in the ROM section. However, ROM Sec. 2752-D may be reasonably construed to include the maximum amount. The California plan amendment is therefore consistent with the ROM section.
 
 
 38
 Agencies must comply with their own regulations. Ramon-Sepulveda v. INS, 9 Cir., 1984, 743 F.2d 1307, 1310; Dyniewicz v. United States, 9 Cir., 1984, 742 F.2d 484, 485, even when the regulations are more generous than required by law, United States v. Newell, 9 Cir., 1978, 578 F.2d 827, 834. However, "[n]ot all agency policy pronouncements which find their way to the public can be considered regulations enforceable in federal court." Rank v. Nimmo, 9 Cir., 1982, 677 F.2d 692, 698, quoting Chasse v. Chasen, 1 Cir., 1979, 595 F.2d 59, 62. The Secretary argues that the ROM is not a regulation, has no legal force and does not bind HCFA, citing the Hearing Officer's Recommended Decision. Appellants argue that whether the ROM section is labeled a "regulation," "directive" or "guideline," California had the right to rely on it in formulating SPA 83-14 and the Secretary must abide by its terms absent a proper repeal.
 
 
 39
 For ROM Sec. 2572-D to have the "force and effect of law," it must satisfy both of the requirements set out by the Supreme Court in Chrysler Corp. v. Brown, 1979, 441 U.S. 281, 301-04, 99 S.Ct. 1705, 1717-19, 60 L.Ed.2d 208. First, it must prescribe "substantive" or "legislative" rather than "interpretive" rules. Id. at 301-03, 99 S.Ct. at 1718. Second, its promulgation "must conform with any procedural requirements imposed by Congress." Id. at 303, 99 S.Ct. at 1718. See also Rank, supra, 677 F.2d at 698. We hold that ROM Sec. 2572-D meets both parts of the Chrysler test and therefore bars the Secretary from disapproving the California plan amendment.
 
 
 40
 1. Legislative v. Interpretive Rules.
 
 
 41
 Substantive or "legislative-type" rules are ones "affecting individual rights and obligations." Chrysler, supra, 441 U.S. at 302, 99 S.Ct. at 1718, which "effect a change in existing law or policy," Powderly v. Schweiker, 9 Cir., 1983, 704 F.2d 1092, 1098, and which are "issued by an agency pursuant to statutory authority ... and implement the statute, as, for example, the proxy rules issued by the Securities and Exchange Commission...." Chrysler at 302-3, 99 S.Ct. at 1718, citing Batterton v. Francis, supra, 432 U.S. at 425 n. 9, 97 S.Ct. at 2405 n. 9. See also Alcaraz v. Block, 9 Cir., 1984, 746 F.2d 593, 613; Fmali Herb, Inc. v. Heckler, 9 Cir., 1983, 715 F.2d 1385, 1387. On the other hand, an interpretive rule is one issued without delegated legislative power. Id. at 1387. Such rules
 
 
 42
 are essentially hortatory and instructional in that they go more 'to what the administrative officer thinks the statute or regulation means' Gibson Wine Co. v. Snyder, 194 F.2d 329, 331 (D.C.Cir.1952), when applied in particular, narrowly defined situations.... By merely clarifying the law's terms as applied situationally, interpretive or administrative-type rules are used more for discretionary fine-tuning than for general law making.
 
 
 43
 Alcaraz, supra, 746 F.2d at 613.
 
 
 44
 The Secretary describes ROM 2572-D as merely an "interpretive guideline." The label that an agency chooses to describe its action is "only indicative and not dispositive, of the agency's intent," which may be inferred from the forseeable effect that the rule will have. Louisiana-Pacific Corp. v. Block, 9 Cir., 1982, 694 F.2d 1205, 1210. Neither is the fact that the Secretary published this provision in the Regional Office Manual, and failed to do so in the Federal Register, dispositive on this issue. See, e.g., United States v. Coleman, 9 Cir., 1973, 478 F.2d 1371.
 
 
 45
 The Secretary argues that the HCFA Regional Office Manual, like the SSA Claims Manual in Schweiker v. Hansen, 1981, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685,
 
 
 46
 is not a regulation. It has no legal force, and it does not bind the SSA. Rather it is a 13-volume handbook for internal use by thousands of SSA employees, including the hundreds of employees who receive untold numbers of oral inquiries like respondent's each year.
 
 
 47
 Id. at 789, 101 S.Ct. at 1471. The Supreme Court in Schweiker held that the "minor breach" of a provision in this manual by an SSA field representative (failure to follow a provision instructing representatives to advise applicants of the advantage of filing written applications) did not estop the SSA from denying the applicant retroactive benefits according to a regulation limiting such benefits to one who "has filed [written] application." Id. at 786, 789, 101 S.Ct. at 1470, 1471. Referring to Schweiker v. Hansen, this court has held that other SSA claims manual provisions do not have "the force and effect of law." Powderly, 704 F.2d at 1096, 1098; Whaley v. Schweiker, 9 Cir., 1981, 663 F.2d 871, 873. Each of the above rules are interpretive, in that they instruct agency employees how the agency thinks a particular statute or regulation should be applied "in particular, narrowly defined situations." Alcaraz, supra, 746 F.2d at 613. "These provisions only explain what the more general terms of the Act and regulations already provide." Powderly, supra, 704 F.2d at 1098.
 
 
 48
 It is clear that agency office manuals generally do not prescribe legislative rules with binding effect. However, the ROM section at issue in this case is an exception. Unlike the office manual provision in the above cases, ROM Sec. 2572-D is not a field-level instructional guide to the application of the statute with respect to the inquiries and circumstances of particular individuals. It is directed not at office-level agency employees and specific recipients but at states and a major category of recipients under state plans. It establishes the right of states to increase their adult couple MNIL and thereby affects the rights of medically needy adults in all states with a Medicaid program. It establishes a new MNIL maximum in this category and thereby "effect[s] a change in existing law or policy," Powderly, supra, 704 F.2d at 1098. Most importantly, this case is distinguished from the cases cited by the Secretary by the statutory basis for the promulgation of ROM Sec. 2572-D.
 
 
 49
 The question whether a given rule is legislative or interpretive turns on whether it is one "issued by an agency pursuant to statutory authority and ... implement[ing] the statute," Batterton, supra, 432 U.S. at 425 n. 9, 97 S.Ct. at 2405 n. 9, or one "issued pursuant to an agency's interpretation of a governing statute without delegated power." Fmali Herb, supra, 715 F.2d at 1387. See also Alcaraz, supra, 746 F.2d at 613; Louisiana-Pacific Corp., supra, 694 F.2d at 1210.
 
 
 50
 In Batterton, the Supreme Court upheld a challenged regulation promulgated by the Secretary of HEW "pursuant to a delegation of rulemaking authority" in Sec. 407(a) of the Social Security Act, 42 U.S.C. Sec. 607(a). Like Section 1903(f) at issue in this case, Section 407(a) directed that a statutory term be "determined in accordance with standards prescribed by the Secretary."[1] The Supreme Court held that Congress "expressly delegated to the Secretary power to prescribe standards" for determining what constituted "unemployment" for purposes of program eligibility. Id. 432 U.S. at 425, 97 S.Ct. at 2405 (emphasis in original).
 
 
 51
 In a situation of this kind, Congress entrusts to the Secretary, rather than to the courts, the primary responsibility for interpreting the statutory term. In exercising that responsibility, the Secretary adopts regulations with legislative effect.
 
 
 52
 Id. See also Herweg v. Ray, 1982, 455 U.S. 265, 274-75, 102 S.Ct. 1059, 1066, 71 L.Ed.2d 137; Schweiker v. Gray Panthers, 1981, 453 U.S. 34, 44, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460. Noting that the Secretary's statutory authority to prescribe standards is not unlimited, the Batterton Court declared "we cannot say that the Secretary's regulation defeats the purpose of the [benefit] program" and upheld the regulation. Batterton, 432 U.S. at 429, 97 S.Ct. at 2407.
 
 
 53
 Unlike the statutes interpreted by the agency manuals in the cases cited by the Secretary, Section 1903(f) expressly authorized the Secretary to prescribe "standards." Congress must have intended that standards thus prescribed by HHS would have the force and effect of law. In promulgating the ROM provision at issue, the Secretary followed the mandate of Section 1903(f). This provision on its face sets out standards for determining "equivalent" adult couple MNILs in relation to payment levels under state AFDC plans. ROM Sec. 2572-D is therefore a rule "issued by an agency pursuant to statutory authority and ... implementing the statute," Batterton, supra, 432 U.S. at 425 n. 9, 97 S.Ct. at 2405 n. 9. Because we cannot say that it defeats the purpose of the Medicaid program, id. at 428-29, 97 S.Ct. at 2407-08, we conclude that ROM Sec. 2572-D is a proper legislative rule.
 
 
 54
 2. Procedural Requirements Imposed by Congress.
 
 
 55
 Once an agency rule or regulation has been determined to be substantive, it nevertheless will not have "the force and effect of law" unless its promulgation conforms "with any procedural requirements imposed by Congress." Chrysler Corp., supra, 441 U.S. at 303, 99 S.Ct. at 1718.
 
 
 56
 Notice and comment procedures set out in the Administrative Procedure Act (APA) generally apply to agency rulemaking with the exception of "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. Sec. 553(b)(A). ROM Sec. 2572-D was not promulgated according to APA procedures. However, the APA requirements do not apply "to the extent there is involved ... a matter relating to ... public property, loans, grants, benefits, or contracts." 5 U.S.C. Sec. 553(a)(2) (emphasis added). The ROM section at issue expressly concerns Medicaid, a benefit program, and falls under the statutory exemption. Cf. Good Samaritan Hospital, Corvallis v. Mathews, 9 Cir., 1979, 609 F.2d 949, 953-54; Baylor University Medical Center v. Heckler, 5 Cir., 1985, 758 F.2d 1052, 1058; Bedford County General Hospital v. Heckler, 6 Cir., 1985, 757 F.2d 87, 90; Humana of South Carolina v. Califano, D.C., Cir., 1978, 590 F.2d 1070, 1083-84 & n. 102. See also Alcaraz v. Block, supra, 746 F.2d at 611.
 
 
 57
 The Secretary voluntarily waived the APA "benefits" exception in 1971. 36 Fed.Reg. 2532 (1971); Good Samaritan Hospital, supra, 609 F.2d at 954. The Department thereby imposed upon itself procedural requirements "not required by law." 36 Fed.Reg. 2532. The Secretary's waiver has a binding effect independent of the APA, see Buschmann v. Schweiker, 9 Cir., 1982, 676 F.2d 352, 356 n. 4; cf. Rodway v. Department of Agriculture, D.C.Cir., 1975, 514 F.2d 809, 814, and would operate to invalidate a challenged substantive rule limiting benefits promulgated in violation of the requirements set out in the APA. However, the 1971 waiver does not overrule or otherwise abrogate Section 553(a)(2), a section which has not been repealed and remains in effect. "[R]ulemaking requirements for agencies managing benefit programs are still voluntarily imposed--i.e., agency-created statutory exceptions. Thus, it is only the Department's own statement of policy that applies the notice and comment provisions to rulemaking in these programs." Alcaraz, supra, 746 F.2d at 611. In promulgating ROM Sec. 2572-D, the Secretary failed to abide by her predecessor's promise to adopt APA rulemaking procedures. Nevertheless, these were not "procedural requirements imposed by Congress." Chrysler Corp., supra, 441 U.S. at 303, 99 S.Ct. at 1718.
 
 
 58
 The APA procedural requirements exist to protect the public's interests, not to shelter the Secretary. As the D.C. Circuit stated, "The essential purpose of according Sec. 553 notice and comment opportunities is to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies." Batterton v. Marshall, D.C.Cir., 1980, 648 F.2d 694, 703. This case does not involve a defectively promulgated regulation challenged by members of the public who claim that they were harmed by losing their right to participate in the administrative rulemaking process. On the contrary, the State and Intervenors emphasize that they had full awareness of the promulgation and existence of ROM Sec. 2572-D. The Secretary does not dispute this. She argues that the ROM section is an "interpretive guideline" that need not be published under the APA or Freedom of Information Act (FOIA), but she also argues that, because California had actual and timely notice of the ROM terms, lack of publication should not be fatal, citing United States v. Mowat, 9 Cir., 1978, 582 F.2d 1194, 1201. See also United States v. Hall, 9 Cir., 1984, 742 F.2d 1153, 1155; Nason v. Kennebec County CETA, 1 Cir., 1981, 646 F.2d 10, 19.
 
 
 59
 The FOIA requires agencies to publish in the Federal Register not only "substantive rules of general applicability adopted as authorized by Law" but also "statements of general policy or interpretations of general applicability formulated and adopted by the agency," 5 U.S.C. Sec. 552(a)(1)(D) and "each amendment, revision, or repeal of the foregoing," Sec. 552(a)(1)(E). There is no "benefits" exemption from the FOIA publication requirement. However, this requirement "attaches only to matters which if not published would adversely affect a member of the public." Zaharakis v. Heckler, 9 Cir., 1984, 744 F.2d 711, 714, citing Hogg v. United States, 6 Cir., 1970, 428 F.2d 274, 280. The Secretary's failure to publish the ROM provision in 1977 in accordance with the FOIA therefore does not affect the validity of the provision. See Rodriguez v. Swank, 318 F.Supp. 289, 295, aff'd 403 U.S. 901, 91 S.Ct. 2202, 29 L.Ed.2d 677.
 
 
 60
 We conclude that ROM Sec. 2572-D meets both prongs of the Chrysler test. It is a legislative rule issued pursuant to statutory authority; its promulgation violated no procedural requirements imposed by Congress. The ROM provision became effective June 1979. When the California legislature enacted SPA 83-14 it had not been properly repealed by HHS nor even removed from publication. ROM Sec. 2572-D therefore had "the force and effect of law," Chrysler, supra, 441 U.S. at 301-05, 99 S.Ct. at 1717-20, and barred the Secretary from disapproving the California plan amendment which conformed to its terms.
 
 
 61
 B. The Deficit Reduction Act (DEFRA).
 
 
 62
 The Act, Pub.L. 98-369, Section 2373(c) provides an additional, independent reason for reversal. This section established a moratorium during which the HHS Secretary
 
 
 63
 shall not take any compliance, disallowance, penalty, or other regulatory action against a State ... by reason of such state's [Medicaid] plan ... being determined to be in violation of [Social Security Act] section 1902(a)(10)(C)(i)(III).
 
 
 64
 DEFRA Section 2373(c)(1). This moratorium began when DEFRA was enacted in July, 1984, before the Secretary's final disapproval of SPA 83-14 in January, 1985. It continues until 18 months after the Secretary reports to Congress as required by DEFRA Section 2373(c)(3). Section 2373(c)(2).
 
 
 65
 Section 1902(a)(10)(C)(i)(III), adopted as a provision of the Tax Equity and Fiscal Responsibility Act (TEFRA) requires that a state Medicaid plan which provides benefits to medically needy recipients include a description of
 
 
 66
 the single standard to be employed in determining income and resource eligibility for all such groups, in the methodology to be employed in determining such eligibility, which shall be the same methodology which would be employed under the ... appropriate State [cash assistance] plan....
 
 
 67
 42 U.S.C. Sec. 1396a(a)(10)(C)(i)(III).
 
 
 68
 Appellants argue that the DEFRA moratorium applies directly to prevent the Secretary from rejecting the California Medi-Cal amendment. They point out that prior to the Administrator's disapproval of SPA 83-14, HCFA stated in agency memoranda and in a letter to the State that such a plan would violate the "single standard" requirement of TEFRA. The Secretary correctly points out that neither the initial nor final decisions disapproving SPA 83-14 expressly claim that the plan amendment violated TEFRA. Her decision relies entirely on the argument that the California plan violated Section 1903(f). However, the California plan amendment raises exactly the kind of problem which Congress addressed by establishing a moratorium on HHS implementation of the TEFRA "single standard" provision.
 
 
 69
 The California legislature enacted the Medicaid plan amendment in response to findings that a single standard did not accurately reflect the comparative need of medically needy adults and children in families receiving assistance under AFDC. Although the Administrator's final decision did not expressly cite Section 1902(a)(10)(C)(i)(III), that decision nevertheless recognized that the California plan amendment raises a TEFRA "single standard" issue.
 
 
 70
 Regardless of the possibly greater maintenance needs of a two-adult family as opposed to an AFDC family of two (one child, one adult), the statute provides for a single MNIL for a family of two.
 
 
 71
 Decision of the Administrator at 4 (emphasis added).
 
 
 72
 Congress intended the DEFRA moratorium to apply in precisely this situation. The DEFRA Conference Committee Report explains that Section 2373 was enacted to correct HHS's "overly restrictive" interpretation of the TEFRA provision. 130 Cong.Rec. H6741 (daily ed. June 22, 1984). One of the examples cited by the conferees corresponds directly to the facts of this case:
 
 
 73
 [T]he Department has taken the position, that the 'single standard' requirement of the TEFRA amendment prohibits States from establishing less restrictive medically needy income levels for single adults and couples because this would result in differences in medically needy income levels among groups of the same size depending on the relative numbers of adults and children.
 
 
 74
 Id. The Conference Report explains that Congress enacted Section 2373 to prevent the Secretary from taking, during the moratorium period, "any compliance, disallowance, penalty or other regulatory action against a State because a State, in determining eligibility for noncash Medicaid recipients, is using an income or resource standard or methodology that is less restrictive than the applicable cash assistance standard or methodology." Id. (emphasis added.) There is no statutory basis for the Secretary's argument that the DEFRA moratorium applies only to already "existing and approved plans." In disapproving SPA 83-14, the Secretary improperly penalized California, in violation of DEFRA Section 2373(c), for adopting a different, less restrictive methodology than that used under the California AFDC plan for a family of two.
 
 
 75
 IV. Conclusion.
 
 
 76
 The California Medicaid plan amendment at issue conforms to the MNIL standards prescribed by the Secretary pursuant to Section 1903(f) of the Social Security Act, set out in ROM Sec. 2572-D. The Secretary's determination that SPA 83-14 violates Section 1903(f) is therefore arbitrary and capricious. Moreover, the Secretary's disapproval of SPA 83-14 violates DEFRA Section 2373(c) and is therefore not in accordance with the law.
 
 
 77
 Because we reverse the Secretary's final determination on statutory grounds, we need not reach the due process claim raised by Intervenors.
 
 
 78
 The Secretary's decision disapproving SPA 83-14 is
 
 
 79
 REVERSED.
 
 
 
 [1]
 42 U.S.C. Sec. 607. Dependent children of unemployed fathers; definition
 "(a) The term 'dependent child' shall, notwithstanding section 606(a) of this title, include a needy child who meets the requirements of section 606(a)(2) of this title who has been deprived of parental support or care by reason of unemployment (as determined in accordance with standards prescribed by the Secretary ) of his father, and who is living with any of the relatives specified in section 606(a)(1) of this title in a place of residence maintained by one or more of such relatives as his (or their) own home." Cited in Batterton, 432 U.S. at 418 n. 2, 97 S.Ct. at 2401 n. 2 (emphasis added).