Gwendolyn GUADAMUZ, et al., Plaintiffs,

v.

Margaret HECKLER, Secretary of Human Services, et al., Defendant.

No. C–84–6396 MHP.

United States District Court, N.D. California.

Oct. 23, 1986.

---

Allan C. Miller, Glenn Clark, Withy, Miller, Gerstler & Clark, Berkeley, Cal., for plaintiffs.

Deborah Seymour Shefler, Asst. U.S. Atty., Civ. Div., San Francisco, Cal., Larry Banks, Asst. U.S. Atty., Office of General Counsel, Social Security Div., Dept. of Health & Human Services, Baltimore, Md., for defendant.

## OPINION

PATEL, District Judge.

Plaintiffs originally brought this class action challenging the Secretary of Health and Human Services ("Secretary") policy of delaying the payment of retroactive benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401–433 (1983) ("Title II") until after retroactive benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383 (1982) ("Title XVI") were calculated and paid in "concurrent claims cases"—cases in which the claimant applies for both types of benefits at roughly the same time and the Secretary ultimately awards both types of benefits retroactively. Plaintiffs alleged that the Secretary's policy artificially reduced the amount of past-due Title II disability benefits from which attorneys' fees could be withheld, providing a disincentive for attorneys to represent claimants in Social Security cases, and resulting in an underpayment of Title XVI Supplemental Security Income ("SSI") benefits to claimants represented by attorneys.

After plaintiffs moved for class certification and a preliminary injunction, but before the court ruled on the motions, the parties entered into a stipulated order under which the Secretary was to submit to the court a set of instructions and procedures to remedy the problems identified by plaintiffs. The Secretary filed her new procedures with the court on July 10, 1985, in the form of an amendment to the Program Operation Manual System ("POMS").

Plaintiffs now move for partial summary judgment and an injunction. Plaintiffs contend that although the new procedures alleviate some of the problems originally complained of, a number of problems remain. For the reasons discussed below, plaintiffs' motion for partial summary judgment and an injunction is granted in part and denied in part.

STATUTORY BACKGROUND

There are two types of federal benefits available to disabled individuals: disability benefits under Title II and SSI benefits under Title XVI. Eligibility for Title II benefits is based on a claimant's insured status and is independent of financial need. Eligibility for Title XVI benefits, on the other hand, is wholly dependent upon financial need; the more "chargeable" income and resources an individual has, the less Title XVI benefits, if any, she will receive. Title II benefits, though not themselves based on need, are considered "chargeable" income for purposes of determining Title XVI eligibility. 42 U.S.C. § 1382a(a)(2)(B). Thus, an award of Title II benefits will generally have the effect of reducing a claimant's Title XVI eligibility, although the reduction will not necessarily be dollar-for-dollar. The amount of Title II benefits a claimant is entitled to is not affected by an award under Title XVI, however.

The problem arises when a claimant has already been receiving Title XVI benefits and then later receives a retroactive award of Title II benefits for the same period. Had the Title II benefits been paid when due, they would have reduced the amount of Title XVI benefits the claimant would

have received. However, where the Title II benefits are paid retroactively, the Title XVI benefits which have already been paid out were never reduced by the amount of Title II benefits. As a result the claimant receives a windfall.

In order to remedy this problem Congress enacted a "windfall offset" provision in 1980. 42 U.S.C. § 1320a–6. Under § 1320a–6, when a claimant is awarded retroactive Title II benefits for a period in which she has already received Title XVI benefits, the Title II benefits are reduced by the amount of Title XVI benefits which the claimant would not have received had the Title II benefits been awarded when due rather than retroactively. The original version of § 1320a–6 did not provide for a similar offset in those cases in which Title II benefits were paid first. Therefore, in order to ensure that the windfall offset would be applied in all concurrent claims cases, the Secretary developed a policy of delaying Title II benefits until after Title XVI benefits had been calculated and paid. This policy, originally termed "Title XVI offset," was effective in all claims adjudicated after June 30, 1981. POMS GN 02610.005 et seq.

In 1984, Congress amended § 1320a–6 to allow for offset regardless of which class of benefits was paid first.[1] This amendment became effective on February 1, 1985 and removed the need to calculate and pay Title XVI benefits first in all cases. Following the amendment of § 1320a–6, the Secretary developed a new set of instructions and procedures for handling concurrent claims cases. When Title II benefits are paid first the Secretary applies the "Title XVI offset" procedures; when Title XVI benefits are paid first the "Title II

offset" procedures are applied. The order in which the benefits are paid is determined by which current monthly benefit check is processed and ready for mailing first.

DISCUSSION

1. *Attorneys' Fees Under § 406*

Attorneys' fees can be recovered for services performed in connection with Title II claims. 42 U.S.C. § 406. Section 406(a) deals with fees awarded at the administrative level. Under § 406(a), "[w]henever the Secretary, in any claim before him for benefits under [Title II], makes a determination favorable to the claimant, he shall [fix] ... a reasonable fee to compensate such attorney for the services performed by him in connection with such claim." 42 U.S.C. § 406(a). In addition to providing for the authorization of attorneys' fees, § 406(a) requires the Secretary to withold up to 25% "of the total amount of past-due [Title II] benefits" and to pay the withheld amount directly to the attorney. However, § 406(a) does not limit the amount of fee which the Secretary may *authorize. See* 20 C.F.R. § 404.1725(b) (1986). However, direct payment is made from past-due benefits of the smallest of 25% of the total past-due benefits, the amount set by the Secretary or the amount agreed upon between the attorney and the claimant. *See* 20 C.F.R. § 404.1730(b) (1986).

Section 406(b) deals with attorneys' fees awarded by a court and provides that, where a court renders a judgment favorable to a claimant who was represented by an attorney, the court may authorize a reasonable fee not to exceed 25% "of the total of the past-due benefits to which the claimant is entitled by reason of such judg-

---

1. Section 1320a–6(a) as amended provides:
   (a) Notwithstanding any other provision of this Act, in any case where an individual—
   (1) is entitled to benefits under title II [42 U.S.C.S. §§ 401 et seq.] that were not paid in the months in which they were regularly due; and
   (2) is an individual or eligible spouse eligible for supplemental security income benefits for one or more months in which the benefits referred to in clause (1) were regularly due, then any benefits under title II [42 U.S.C.S. §§ 401 et seq.] that were regularly due in such

month or months, or supplemental security income benefits for such month or months, which are due but have not been paid to such individual or eligible spouse shall be reduced by an amount equal to so much of the supplemental security income benefits, whether or not paid retroactively, as would not have been paid or would not be paid with respect to such individual or spouse if he had received such benefits under title II [42 U.S.C.S. §§ 401 et seq.] in the month or months in which they were regularly due.

ment." 42 U.S.C. § 406(b)(1). Section 406(b) further provides that the Secretary may withhold "the amount of such fee for payment [directly] to such attorney out of, and not in addition to, the amount of such past-due benefits." *Id.* Thus, unlike § 406(a), subsection (b) limits both the total fee the court may authorize and the amount the Secretary can withhold to 25% of the total "past-due benefits."

The Secretary has defined "past-due benefits" by regulation as "the total amount of benefits *payable* under title II of the Act to all beneficiaries that has accumulated because of a favorable administrative or judicial determination or decision, up to but not including the month the determination or decision is made." 20 C.F.R. § 404.1703 (emphasis added). The Secretary has elaborated on this definition in the preamble to 20 C.F.R. § 404.408b, the final regulations implementing 42 U.S.C. § 1320a–6:

> As for attorneys' fees, the amount of retroactive benefits that is subject to withholding for payment of an attorney's fee is the total amount of retroactive Social Security benefits *payable* to the beneficiary (see § 404.1703). The amount payable is the amount of retroactive benefits less the amount of any deductions, reductions, or overpayments applicable to the retroactive period. Thus, the amount of retroactive benefits *payable* for purposes of withholding an attorney's fee is the amount of retroactive Social Security benefits reduced by the amount of any SSI payments received in the retroactive period.

47 Fed.Reg. 4986 (Feb. 1982).

In other words, the Secretary has interpreted "past-due benefits" under § 406 to mean net, post-offset Title II benefits. In cases in which Title XVI benefits are paid first, the Secretary's interpretation has the effect of artificially reducing the amount of

Title II benefits available from which to withhold attorneys' fees under 406(a) and (b) and from which to authorize attorneys' fees under § 406(b).[2] Indeed, in those instances in which Title II benefits are totally offset by the Title XVI benefits previously paid, no attorneys' fee will be withheld and, under § 406(b), no fee can be authorized. Plaintiffs contend that the Secretary's interpretation of "past-due benefits," as applied in offset cases, contravenes the Congressional purpose behind § 406 to encourage legal representation of Social Security claimants. Plaintiffs argue that "past-due benefits" should be construed to mean gross, pre-offset benefits.

The Secretary's interpretation and implementation of § 406 is entitled to great deference. *See, e.g., Herweg v. Ray*, 455 U.S. 265, 275, 102 S.Ct. 1059, 1066, 71 L.Ed.2d 137 (1982); *Schweiker v. Gray Panthers*, 453 U.S. 34, 44, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981); *Cubanski v. Heckler*, 781 F.2d 1421, 1427 (9th Cir.1986). "However, an agency's interpretation is not always infallible, and the courts must remain the final authorities on critical questions of statutory construction." *Fagner v. Heckler*, 779 F.2d 541, 543 (9th Cir.1985). A court need not defer to the Secretary's interpretation where there are compelling indications that her interpretation is wrong, *Id.*, or where her construction is arbitrary, capricious or manifestly contrary to the statute. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694, *reh. den.*, 467 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984).

Section 406 was enacted with a dual purpose. One purpose is to protect claimants from exorbitant attorneys' fees, especially those resulting from contingent fee arrangements. S.Rep. No. 404, 89th Cong.,

---

**2.** For example, assume a claimant is entitled to $10,000 in Title II benefits and $9,000 in Title XVI benefits, each entitlement calculated independently of the other. If Title II benefits are paid first, the court can authorize up to $2,500 (25% of $10,000) in attorneys' fees under § 406(b) and the Secretary can withhold and pay directly to the attorney up to $2,500 under either § 406(a) or (b). However, assume the

$9,000 in Title XVI benefits are paid first. Under § 1320a–6, the $10,000 Title II entitlement must be offset by the $9,000 Title XVI award, leaving only $1,000 in Title II benefits. The result is that the court could authorize only $250 in attorneys' fees under § 406(b) and the Secretary could withhold and pay directly to the attorney only $250 under either subsection (a) or (b).

1st Sess., 118 *reprinted in* 1965 U.S.Code Cong. & Ad.News, 1943, 2062; *Detson v. Schweiker,* 788 F.2d 372, 376 (6th Cir.1986); *Burnett v. Heckler,* 756 F.2d 621, 625 (8th Cir.1985); *Davis v. Secretary of HEW,* 320 F.Supp. 1293, 1296 (N.D.Miss.1970). This goal is accomplished under § 406 primarily by having the Secretary or court determine and authorize a "reasonable" fee, *Reid v. Heckler,* 735 F.2d 757, 760–761 (3rd Cir. 1984); *Taylor v. Heckler,* 608 F.Supp. 1255, 1257 (D.C.N.J.1985); and by prohibiting attorneys from charging any more than the authorized fee.

The other goal of § 406 is to "encourage effective legal representation of claimants by insuring lawyers that they will receive reasonable fees directly through certification by the Secretary." *Dawson v. Finch,* 425 F.2d 1192, 1195 (5th Cir.), *cert. denied,* 400 U.S. 830, 91 S.Ct. 60, 27 L.Ed.2d 60 (1970). *Accord, Wheeler v. Heckler,* 787 F.2d 101, 107 (3rd Cir.1986); *Burnett,* 756 F.2d at 626; *Reid,* 735 F.2d at 760–61; *Kovar v. Heckler,* 622 F.Supp. 967, 970–71 (N.D.Ohio 1985). Obviously, the Secretary's interpretation of "past-due benefits" contravenes this second goal. By artificially reducing the amount of Title II benefits from which attorneys' fees may be withheld (and, in § 406(b) cases, authorized), the Secretary's approach provides a significant disincentive to attorneys who might otherwise be willing to represent Social Security claimants in what is often a long, frustrating and minimally remunerative endeavor.[3] In view of the limitations of 20 C.F.R. § 404.1730(b) most attorneys will be effectively precluded from obtaining a reasonable fee where the recoupment of SSI payments is significant. The Secretary's position also ignores the consideration set forth in 20 C.F.R. § 404.1725(b) for determining a reasonable fee.

At the same time, the Secretary's interpretation does little if anything to promote the goal of protecting claimants from exorbitant attorneys' fees. In § 406(a) cases, the Secretary's interpretation has no effect on the amount of the fee authorized and owing to the attorney; this amount is determined independently of the offset procedures. In § 406(b) cases, the Secretary's interpretation *will* substantially decrease the amount of attorneys' fees awarded. However, the purpose of § 406 is not to minimize attorneys' fees but, rather, to insure that they are reasonable. Artificially reducing the amount of fees to a level which in many cases will be "unreasonable" by any standard, will hardly serve the goal of ensuring that attorneys' fees are reasonable and not exorbitant. Rather, as noted above, this goal is achieved by prohibiting attorneys from charging a fee in excess of that which the Secretary or court expressly determines to be reasonable.

In addition, the Secretary's construction leads to results which can only be described as arbitrary and capricious. Under current procedures, whether Title II benefits or Title XVI benefits are paid first is wholly dependent on which current monthly benefit check is processed and ready for mailing first. If the Title II check is mailed first, the attorneys' fees will be withheld (and, under § 406(b), calculated) based on the gross amount of Title II benefits. If, on the other hand, the Title XVI check is mailed first, these calculations will be made on the substantially smaller post-offset amount. Thus, two attorneys who do the same work and achieve the same results

---

**3.** Prior to the issuance of 20 C.F.R. § 404.408b, several commentators called to the Secretary's attention the possible adverse impact her policy would have on attorneys' fees under § 406(a) and, therefore, on the ability of claimants to find legal representation. The Secretary rejected these comments on the basis that her approach affected only the amount of fee *withheld* under § 406(a), not the amount of fee *authorized* and, therefore, was unlikely to serve as a disincentive to attorneys. 47 Fed.Reg. 4987 (Feb.1982). There are two problems with the Secretary's response. First, it ignores the fact that her approach *will* adversely affect the amount of fees *authorized* under § 406(*b*). Second, even with respect to § 406(a), the Secretary's approach will affect the amount *actually received* by the attorney to the extent the attorney is unable to collect the fee from his or her client. Yet, it was precisely because attorneys were having difficulty collecting their fees that Congress provided for direct payment under § 406.

for their respective clients may receive significantly different attorneys' fees simply because one client's Title II benefits are processed first while the others' Title XVI benefits are processed first. Of course, an attorney has no way of knowing at the time he decides whether to take a case whether his client will fall into the former category or the latter. In effect, the Secretary has turned § 406 into a sort of roulette wheel for attorneys' fees; a result clearly at odds with the Congressional intent behind § 406.

If this result were mandated by § 1320a-6, the court would have no choice but to defer to Congress' judgment on the matter. But it is not. Section 1320a-6 was enacted after § 406 [4] for the purpose of preventing windfalls—a problem wholly unrelated to the issue of attorneys' fees. There is simply no evidence in the statutory language or legislative history that § 1320a-6 was intended in any way to affect the authorization or certification of attorneys' fees under § 406.

Section 1320a-6 is essentially a procedural mechanism for recouping Title XVI benefits that should not have been paid and would not have been paid had Title II benefits been paid when due. Congress could have achieved this recoupment simply by treating it as an overpayment and requiring the claimant to return the excess amount. The claimant could then be mailed a check for the full amount of his or her Title II entitlement. However, for obvious reasons, Congress found it more expedient to combine the two transactions into one by reducing the Title II check by the amount of the Title XVI "overpayment." Although the end result of applying this procedure is to reduce the amount of the Title II check received by the claimant, the *purpose* of the procedure is actually to recover Title XVI benefits to which, in retrospect, the claimant was not entitled. *See* S.Rep. No. 408, 96th Cong., 2d Sess. 78, *reprinted in* 1980 U.S.Code Cong. & Ad.News 1277, 1356.

In other words, the reduction in the claimant's Title II check does not represent a substantive reduction in the claimant's Title II "entitlement," but rather, is an incidental result of the procedural mechanism chosen by Congress to implement a retroactive reduction in the claimant's Title *XVI* entitlement.[5] The problem with the Secretary's approach is that it ignores this distinction and uses the procedural mechanism of § 1320a-6 to create an artificial substantive reduction in the claimant's Title II benefits, resulting in a corresponding reduction in attorneys' fees under § 406.

Although this issue appears to be one of first impression in the Ninth Circuit, a number of courts in other circuits have grappled with the problem. Interestingly, the district courts have unanimously rejected the Secretary's construction while the courts of appeal that have considered the matter have all approved the Secretary's interpretation. *See, e.g., Wheeler v. Heckler*, 607 F.Supp. 646 (D.N.J.1985), *rev'd*, 787 F.2d 101 (3rd Cir.1986); *Carlisi v. Secretary of Health and Human Services*, 583 F.Supp. 135 (E.D.Mich.1984), *expressly disapproved, Detson v. Schweiker*, 788 F.2d 372 (6th Cir.1986); *Kovar v. Heckler*, 622 F.Supp. 967 (D.C.Ohio 1985), *implicitly disapproved, Detson, id.; Burnett v. Secretary of Health and Human Services*, 563 F.Supp. 789 (W.D.Ark.1983), *rev'd*, 756 F.2d 621 (8th Cir.1985); *Cuthbert v. Secre-*

---

**4.** At the time § 406 was enacted, there was no provision requiring that Title II and Title XVI benefits be offset by one another. Thus, Congress clearly did not have this problem in mind when it enacted § 406 and chose the term "past-due benefits." On the contrary, because no offset provision existed, attorneys' fees necessarily were authorized and withheld based on gross Title II benefits.

**5.** For this reason, the court rejects the Secretary's position that in calculating the past-due benefits to which a claimant is "entitled" for purposes of § 406, the claimant is "entitled" only to the net amount of Title II benefits actually paid. The court further notes that § 1320a-6 refers to benefits to which a claimant is "entitled" but which were "not paid" when "due"—language quite similar to the language in § 406 at issue here. Yet in § 1320a-6, this language clearly refers to pre-offset, rather than post-offset, Title II benefits. Although obviously not controlling, this lends further support to the court's conclusion that the Secretary's construction is erroneous.

*tary of Health and Human Services,* 784 F.2d 1157 (4th Cir.1985); *Motley v. Heckler,* 605 F.Supp. 88 (W.D.Va.1985); *McKenzie v. Heckler,* 602 F.Supp. 1150 (D.Minn. 1985), *rev'd,* 787 F.2d 1216, (8th Cir.1986).[6]

The court respectfully declines to follow the decisions of the courts of appeal, which are not binding on this court, and instead, for the reasons discussed above, agrees with the conclusions reached by the district courts. The court finds the court of appeals opinions unpersuasive for a number of reasons.

The Eighth Circuit's opinion in *Burnett* relies heavily on § 406's goal of protecting claimants from exorbitant attorneys' fees. 756 F.2d at 625. However, as discussed above, the Secretary's construction does little if anything to promote this goal while completely contravening the goal of encouraging attorneys to represent claimants by insuring them a reasonable fee.

The *Burnett* court also relies heavily on its conclusion that it is the direct payment feature of § 406 which provides the incentive to attorneys and that since the Secretary's construction affects only the *amount* paid directly to the attorney and not the direct payment feature itself, the incentive remains. 756 F.2d at 626. This conclusion is supported neither by the statute nor logic. Even assuming that the direct payment feature was intended to be the primary incentive, obviously this feature provides little incentive if the amount paid is unreasonably low or, as in some cases, nonexistent. Section 406 provides an incentive to attorneys by insuring that they will *actually receive* a *reasonable* fee. Insuring that they will actually receive an unreasonably low fee or that they will be authorized, but never actually receive, a reasonable fee provides little incentive.

Finally, the court in *Burnett* relies on the assumption that the Secretary's approach "preserves a greater portion of the benefits for the claimant." 756 F.2d at 626. This is not necessarily true. In

406(a) cases, the amount of fee *authorized* and *owing* to the attorney will not be affected. Thus, the claimant will retain a greater portion of his benefits only if he refuses to pay his attorney. But it was precisely to protect attorneys from such nonpayment that the direct payment provision was included in § 406.

Even in § 406(b) cases, many claimants may not actually receive a significantly greater portion of the benefits awarded. As discussed in more detail below, where the state has paid a claimant interim welfare benefits pending resolution of the claimant's application for Social Security benefits, the Secretary is authorized to withhold and pay directly to the state a portion of any Title XVI benefits subsequently awarded. By, in effect, artificially increasing the amount of Title XVI benefits received by the claimant, the Secretary's approach provides a greater amount from which the Secretary may withhold and pay reimbursement to the state. Thus, in many cases, at least some of what the claimant saves in attorneys' fees he or she loses in additional reimbursement to the state.

The Sixth Circuit in *Detson* relies almost exclusively on the reasoning of the *Burnett* court in upholding the Secretary's construction of § 406. As discussed above, the court does not find this reasoning persuasive.

The court in *Wheeler,* like the courts in *Burnett* and *Detson,* gives considerable weight to the goal of protecting claimants from exorbitant attorneys' fees. As discussed above, the court believes this emphasis is misplaced in the context of these cases. In addition, the *Wheeler* court relies heavily on the fact that although the Secretary's approach reduces the amount of Title II benefits available for attorneys' fees, it has the beneficial effect of increasing the amount of Title XVI benefits available for reimbursement to the states, thereby providing an incentive for states to provide interim welfare assistance. 787 F.2d at 106–07. While this may well be a lauda-

---

6. A number of the district court rulings are based, to some extent, on the conclusion that § 1320a–6 simply does not apply to concurrent

claims cases. However, plaintiffs here concede that § 1320a–6 may properly be applied in concurrent claims cases and the court agrees.

tory goal, there is nothing in § 406 or § 1320a–6 to suggest that Congress intended the states to benefit at the attorneys' expense.[7] Indeed, such a result would seem rather ironic in light of the fact that in most cases, but for the attorney's representation, the claimant would have received no benefits and the state would therefore have received no reimbursement at all.

Finally, in *Cuthbert,* the Fourth Circuit upheld the Secretary's construction without any discussion or analysis. Under these circumstances, the court's decision is not particularly helpful or persuasive.

The problem with each of these cases is that they place great emphasis on policy objectives, but fail to consider the actual procedures and calculations that are taking place. It is the SSI benefits which are being adjusted when offsets are made against Title II payments. The claimant has received more than she is entitled to under Title XVI because the benefits she is subsequently awarded under Title II are includable as income under Title XVI. Solely by reason of the Secretary's order of determination under these two titles, the claimant receives an inflated aware under Title XVI. The amount actually payable to her as a claimant under Title II is not affected. This is why the court's reliance on *Cloyd v. Weinberger,* 527 F.2d 1167 (6th Cir.1976), in *Burnett* and *Wheeler* is unsound. *Cloyd* involved the deduction of worker's compensation payments from Title II benefits. However, these deductions are required by statute, 42 U.S.C. § 424a in determining the amount of benefits to which a Title II claimant is entitled. Thus, they are comparable to the provisions of Title XVI which specify includable income for the purpose of determining the benefits a claimant is entitled under that title. They are not procedural devices to recoup amounts paid under another title, which is the case here.

The policy argument of reimbursing the states is not persuasive either. Reimburse-ment to the state is required because of the interim payments made in lieu of SSI, not disability. There is no justification for recouping those amounts out of disability payments except to the extent they reflect excess SSI payments.

For the foregoing reasons, the court concludes that the Secretary's construction is "manifestly contrary to the statute" is therefore not entitled to deference. The court holds that for purposes of applying § 406 in concurrent claims cases, "past-due benefits" means the actual Title II benefits payable before offset for Title XVI benefits.

Accordingly, the Secretary shall calculate and withhold attorneys' fees based on pre-offset Title II benefits. In furtherance of this order the Secretary shall issue instructions to all necessary offices to implement this order within fifteen days of this order.

### 2. *Unremedied Underpayments*

Although Title II benefits are considered income for purposes of determining Title XVI eligibility, attorneys' fees incurred in connection with obtaining Title II benefits are excluded from "chargeable" income. 20 C.F.R. § 416.1123(b)(3). In other words, that portion of a Title II award which the claimant must pay to his or her attorney is not counted as income for purposes of calculating Title XVI benefits.

Plaintiffs contend that because of the Secretary's offset procedures, underpayments occurred from July 1, 1981 (when the original "Title XVI offset" procedures began) through June 14, 1985 (when the new POMS procedures were issued), and that no remedy has been provided for underpayments which occurred before February 1, 1985 (the effective date of the new POMS procedures). Plaintiffs contend the underpayments occurred because in offsetting retroactive Title II benefits by the amount of Title XVI benefits already paid, the Secretary's former offset procedures

---

**7.** The Secretary argues that withholding attorneys' fees based on pre-offset Title II benefits may lead to a windfall in some cases because it will reduce the amount of Title II benefits available for offset. The circumstances under which this is likely to occur are rare. It does not justify the Secretary taking the action disapproved by this order. The Secretary can adopt other procedures and payout schedules to avoid this problem.

did not exclude attorneys' fees from countable income as required. For ease of discussion, plaintiffs' argument can be broken down in to four separate contentions.

   a. *Underpayments occurred from July 1, 1981 through June 14, 1985 as a result of the Secretary's offset procedures.*

The Secretary conceded during oral argument that underpayments occurred in a significant number of concurrent claims cases.[8] She contends, however, that underpayments did not occur in *all* concurrent claims cases. Plaintiffs do not allege that underpayment occurred in *all* cases, nor must they make any such showing. It is clear both from the Secretary's procedures and her own admissions that underpayments occurred in significant numbers from July 1, 1981 through June 14, 1985. Plaintiffs are entitled to summary judgment on this issue.

   b. *From July 1, 1981 through June 14, 1985 no procedure existed for claimants to recover the underpayments.*

   The Secretary claims that although she did not issue formal procedures for adjusting the underpayments until June 1985, 20 C.F.R. 416.1123(b)(3) provided sufficient notification to the public that it was the Social Security Administration's (SSA) policy to deduct Title II legal fees from chargeable income in calculating Title XVI benefits. The Secretary apparently argues that, having been given notice of the SSA's general policy, any claimant who believed he or she had received an underpayment should have brought this to the SSA's attention and the underpayment would have been corrected.

The Secretary's position is frivolous. First, even if the mere publication of § 416.1123(b)(3) in the Federal Register could be deemed "notice" of the Secretary's general policy regarding the exclu-

sion of legal fees, it certainly does not provide notice that the procedures applied by the Secretary in offset cases routinely resulted in a violation of that policy. Second, it is by no means clear that even a claimant or a claimant's attorney who was on the "look out" for an underpayment could have figured out from the information sent to them by the SSA whether, and to what extent, an underpayment had occurred. Finally, even if a claimant determined that an underpayment had occurred and brought this to the SSA's attention, no procedures or instructions existed to perform the adjustments.

It seems clear that no meaningful remedy existed from July 1, 1981 through June 14, 1985 for the vast majority of claimants who were underpaid as a result of the Secretary's offset procedures. Plaintiffs are therefore entitled to summary judgment on this issue.

   c. *Inadequate remedy for claims adjudicated before Feb. 1, 1985.*

Noting that the POMS underpayment-remedy procedure appears to apply only to claims adjudicated after February 1, 1985, plaintiffs argued in their opening brief that any underpayments which occurred between July 1, 1981 and February 1, 1985 remain completely unremedied. In her opposition brief, however, the Secretary suggested for the first time that the new POMS procedures *do* apply to claims adjudicated prior to February 1, 1985 and that adjustments will be made *if the claimant or the claimant's attorney brings the case to the SSA's attention.* See POMS SI A02006.008.B.1. While this provides a *potential* "remedy" for underpayments occurring prior to February 1, 1985, it is obviously of little help to claimants whose claims have already been adjudicated and who are unaware either that an underpayment occurred or that the new procedures provide a retroactive "remedy."

---

**8.** The Secretary estimated that in approximately 20%–25% of all concurrent claims cases, underpayments occurred *which were not brought to the Secretary's attention* by the claimant. It is unclear in how many additional cases underpayments occurred which *were* brought to the Secretary's attention.

In a letter submitted in response to the court's inquiries during oral argument, the Secretary has outlined a "computer run" identifying claimants who received an underpayment during the relevant time period. The Secretary indicates that most such claimants could be identified by the computer run and their underpayment calculated within 120–135 days.

.The court finds that this is the most efficient and effective means of remedying the past underpayments. Accordingly, the Secretary shall begin implementing the system immediately. The Secretary shall identify all underpaid claimants who can be identified by computer, calculate the amount of their underpayment, and distribute reimbursement checks within six (6) months from the date of this order. In addition, the Secretary will be required to publish a written notice in major newspapers throughout the state of California in order to provide notice to those claimants who can not be identified by computer. The Secretary shall provide plaintiffs' counsel a plan for publication within fifteen days of this Order. The plan shall include the proposed notice, places, times and frequency of publications. Plaintiffs shall have ten days to respond or object to the notice plan. The first publication or notice shall be accomplished within 45 days of the date of this Order.

### d. *Underpayments continue under current POMS procedures.*

Plaintiffs originally alleged that even under the new POMS procedures underpayments occur in some concurrent claims cases because of the nature of the "fee subtraction" instructions. The Secretary has since revised these instructions and plaintiffs concede that the new instructions remedy the problem identified in their opening brief.

Plaintiffs now allege, however, that the revised instruction is not actually being applied by most field offices and that current procedures are insufficient to ensure that affected cases are properly identified and monitored. These allegations are based on conversations between plaintiffs'

attorney David Calvert and several claims representatives and supervisors. In response, the Secretary has submitted the affidavit of SSA attorney Connie McKensie. Ms. McKensie's affidavit suggests that the fee subtraction instructions have been received and are being properly implemented by the field offices.

It appears that some of the discrepancy might be due to the fact that Mr. Calvert spoke with SSA personnel very shortly after the revised instructions were promulgated. In any event, to the extent plaintiffs still believe the instructions are not being properly implemented, there clearly exists a factual dispute making summary judgment on this issue inappropriate.