Dora WILLEY, Lillian Buchan, and the Maine Association of Interdependent Neighborhoods, Plaintiffs,

v.

Rollin IVES, in his capacity as Commissioner of the Maine Department of Human Services,

and

Otis R. Bowen, Secretary, U.S. Department of Health and Human Services, Defendants.

Civ. No. 85–0295–B.

United States District Court, D. Maine.

Sept. 30, 1988.

Jack Comart, Pine Tree Legal Assistance, Inc., Augusta, Me., Tim Vogel, Legal Services for the Elderly, Inc., Portland, Me., for plaintiffs.

James Mitchell, Asst. Atty. Gen., Augusta, Me., Lawrence E. Burstein, Dept. of Health and Human Services, Boston, Mass., for defendants.

## MEMORANDUM AND ORDER

CYR, Chief Judge.

## I. BACKGROUND

This case arises under the Medicaid Program. Medicaid was established in 1965 as a cooperative federal and state cost-sharing venture for the provision of basic medical services to eligible applicants, Pub.L. No. 89–97, 79 Stat. 343 (1965), as amended, 42 U.S.C. §§ 1396 *et seq.* States choosing to participate in the program are required to follow federal guidelines, 42 U.S.C. § 1396. The United States Secretary of Health and Human Services (formerly the Secretary of Health, Education and Welfare) is entrusted with the administration of the Act and must approve the state plans of medical assistance before the participating states are allowed to receive any federal monies.

*Hogan v. Heckler,* 769 F.2d 886, 887–88 (1st Cir.1985), *cert. denied sub nom, Hogan v. Bowen,* 478 U.S. 1007, 106 S.Ct. 3301, 92 L.Ed.2d 715 (1986).

There are two groups of eligible beneficiaries under Medicaid. The first group, the "categorically needy," consists of those

individuals who qualify for Medicaid by virtue of their eligibility for Aid to Families with Dependent Children [AFDC] or Supplemental Security Income [SSI]. Congress considers the categorically needy "especially deserving of public assistance" for medical expenses, *Schweiker v. Gray Panthers*, 453 U.S. 34, 37, 101 S.Ct. 2633, 2636, 69 L.Ed.2d 460 (1981), because they "earn[ ] less than what has been determined to be required for the basic necessities of life," *Atkins v. Rivera*, 477 U.S. 154, 157, 106 S.Ct. 2456, 2458, 91 L.Ed.2d 131 (1986). Since AFDC and SSI cover only basic necessities (other than medical expenses), payment of medical expenses by categorically needy persons would have to be made from funds provided under AFDC or SSI for other basic necessities. Therefore, medical coverage is mandated for the categorically needy, and states electing to participate in the Medicaid program are required to provide coverage to the "categorically needy." *Id.*

■ The second group eligible for Medicaid, the "medically needy," consists of those individuals whose incomes are too high to qualify for AFDC or SSI, but too low to meet medical expenses without financial assistance.

> The medically needy may qualify for financial assistance for medical expenses if they incur such expenses in an amount that effectively reduces their income to the eligibility level. Only when they "spenddown" the amount by which their income exceeds that level are they in roughly the same position as persons eligible for AFDC or SSI: any further expenditures for medical expenses then would have to come from funds required for basic necessities. *Id.* at 158, 106 S.Ct. at 2459.

States electing to participate in the Medicaid program may opt to provide coverage for the "medically needy."

A state which elects to cover the "medically needy" must determine eligibility under "standards that are 'reasonable' and 'comparable for all groups.'" 42 U.S.C. § 1396a(a)(17).

> In addition, ... state plans for Medicaid must describe "the single standard to be employed in determining income and resource eligibility for all such groups, and the methodology to be employed in determining such eligibility which *shall be the same methodology which would be employed* under [AFDC or SSI]." 42 U.S.C. § 1396a(a)(10)(C)(i)(III).

*Id.* (*emphasis in original*). See also *Hogan*, 769 F.2d at 887–88.

The State of Maine, which participates in the Medicaid program, has elected to extend coverage to its "medically needy."

## II. THE PARTIES AND THEIR POSITIONS

The plaintiff class consists of:

> All individuals in the State of Maine who have received or applied for Medicaid benefits under the SSI–related Medically Needy Program since July 1, 1985 and who own resources having an equity value in excess of $1,600 and who have made a "bona fide effort to sell" such resource, as defined in the Secretary's Program Operations Manual System (POMS) SI 01130.330, but who have been unable to do so notwithstanding such "bona fide effort to sell" or because the resource is unsalable due to a specified condition.

*Willey v. Ives*, Civ.No. 85–0295–B (D.Me. Feb. 10, 1986) (order granting class certification).

Plaintiffs contend that a memorandum, issued by Henry R. Desmarais, M.D., Di-

rector of the Bureau of Eligibility, Reimbursement and Coverage of the Health Care Financing Administration of the United States Department of Health and Human Services, [Desmarais Memorandum], precipitated the elimination of the bona-fide-effort-to-sell exclusion rule in Maine. Accordingly, plaintiffs request that the court (1) declare unlawful the policy of the Secretary of Health and Human Services [Secretary] rendering medically needy persons ineligible for Medicaid by reason of their ownership of excess resources which they are making a bona-fide effort to sell; and (2) permanently enjoin the defendants from implementing policies and regulations rendering medically needy persons ineligible for Medicaid due to their ownership of excess resources which they are making a bona-fide effort to sell.

The Secretary contends that the Desmarais Memorandum does not preclude a state from excluding the value of resources which the individual lacks the *power* to sell. Therefore, the Secretary argues, neither the Desmarais Memorandum nor the Department's bona-fide-effort-to-sell policy violates "the comparability or the same methodology requirements of the Medicaid provisions of the Social Security Act." Memorandum of the Defendant Secretary in Support of Motion to Dismiss or for Summary Judgment, and in Opposition to Plaintiff's Motion for Summary Judgment, at 3 [Secretary's Memo].

The Commissioner of the Maine Department of Human Services [Commissioner] asserts that the State of Maine eliminated the bona-fide-effort-to-sell provision from the Maine Public Assistance Payments Manual [MPAPM][1] in direct response to the Desmarais Memorandum. The MPAPM previously provided that property would be excluded from the computation of an individual's resources for Medicaid eligibility if a bona-fide effort had been made in the relevant geographic area to sell the property at a fair market value, or if two knowledgeable sources in the geographic area agreed that the property was not salable due to a specified condition. State Defendant's Memorandum in Support of Summary Judgment, at 2 [Commissioner's Memo].

The Commissioner and plaintiffs share the view that the Desmarais Memorandum violates federal law and regulations if its effect is to eliminate or clarify the bona-fide-effort-to-sell policy. The Commissioner does not oppose either a judicial declaration otherwise interpreting the Desmarais Memorandum or injunctive relief preventing enforcement of the policy stated in the Desmarais Memorandum. The Commissioner demands the dismissal of all claims and suggests that attorney fees and costs should be borne by the Secretary.

There being no factual disputes, all parties move for summary judgment.[2]

## III. STATUTORY INTERPRETATION

The Secretary's interpretation of the Medicaid Act is entitled to deference. *FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 31–32, 102 S.Ct. 38, 41–42, 70 L.Ed.2d 23 (1981). However, "the courts are the final authorities on

---

1. A memorandum from the State Director of Medicaid Eligibility, addressed to Holders of Assistance Payments Manuals, and dated June 24, 1985, discusses major policy changes. The third such change states:

    For SSI–related cases, the resource exemption of property listed for sale with a bonafide (sic) effort to sell is being removed as an exemption. HCFA has instructed Medicaid

agencies that this provision is not applicable to Medicaid eligibility.... Change 3 is made as a result of HCFA Memorandum 85–4 [the Desmarais Memorandum] requiring this change in Medicaid eligibility.

2. The Secretary moves to dismiss for lack of jurisdiction as well. *See* text *infra*, at 1401.

issues of statutory construction. They must reject administrative constructions of the statute ... that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement." *Id.* at 32, 102 S.Ct. at 42. *See also Commonwealth of Mass. Dep't of Educ. v. United States Dep't of Educ.*, 837 F.2d 536, 541 (1st Cir.1988) (discussion of deference due agency interpretations of statutes entrusted to agency administration); *Hogan*, 769 F.2d at 897 (Secretary's interpretation of regulation prevails if no less reasonable than that proposed by other litigants).

## IV. DISCUSSION

The Desmarais Memorandum states as follows:

> The following item concerns a recent development in SSI policy which affects Medicaid eligibility.
>
> SSI instructions relating to "bona fide effort to sell" contained in the Social Security Administration (SSA) Program Operations Manual System (POMS) at SI 01130.330 appear to permit a blanket exclusion for an asset that is not salable at the asking price or original current market value. To the extent the instruction would authorize this treatment of resources, the POMS provision is not a correct reflection of SSI resource policy. SSI resource policy on this subject is reflected in Social Security Administration Ruling (SSR 83–30a) under which there is no "bona fide effort to sell" policy in SSI that would create such a blanket exclusion of resources. As such, any State policy which extends Medicaid eligibility on the basis of a "bona (sic) effort to sell" policy which provides for a blanket exclusion from resources of an asset which is not salable at the asking price or original current market value would be more liberal than SSI policy. In other words, Medicaid eligibility can

no longer be extended to individuals who have excess resources and who are making a bona fide effort to sell. Medicaid eligibility based on "bona fide effort to sell" does not exist. Individuals who have excess resources are ineligible for Medicaid.

> In general, section 1902(a)(10)(A) of the Act applicable to the categorically needy and section 1902(a)(10)(C) applicable to the medically needy do not permit States to apply eligibility criteria more liberal than the eligibility criteria applied under the SSI program. Additionally, section 1902(f) and 42 C.F.R. 435.121 (which relates only to 209(b) States) permits States to be more restrictive but not more liberal than SSI.

> As this represents a clarification of policy, States which require a change in policy must implement such a change by the first day of the month following the 60th day from the date of the memorandum.

In considering whether the Desmarais Memorandum modifies or merely clarifies federal policy governing the resource eligibility standards for the "medically needy," the court first compares the policy articulated in the Desmarais Memorandum with pre-Desmarais Memorandum policies and procedures. Then the court evaluates the statutory basis for the Secretary's implementation of the Desmarais Memorandum policy.

### A. *The 'Same Methodology' Requirement*

The Medicaid statute requires that the states use:

> reasonable standards (which shall be comparable for all groups ...) for determining eligibility for and the extent of medical assistance ... which ... provide for taking into account only such income and resources as are, as determined in accordance with standards prescribed by

the Secretary, available to the applicant or recipient and ... as would not be disregarded (or set aside for future needs) in determining his eligibility for such aid, assistance or benefits.

42 U.S.C. § 1396a(a)(17)(B) (1982). The methodology of Medicaid eligibility determinations among the medically needy "shall be the same methodology which would be employed under the supplemental security income program in the case of groups consisting of aged, blind, or disabled individuals in a State in which such program is in effect." 42 U.S.C. § 1396a (a)(10)(C)(1)(III) (1982).

The Supreme Court recently addressed the "same methodology" requirement.

When Medicaid was first enacted, Congress did not require that the "same methodology" be used for determining the eligibility of categorically and medically needy individuals. Instead, it required only that a State's Medicaid plan use "comparable" standards for both groups. The Secretary and several Courts of Appeals interpreted the original "comparability" language to require virtually identical treatment....

Congress concluded that the administrative and judicial interpretation of the "comparability" provision denied States necessary flexibility to set eligibility standards and to adjust the scope of services to fit the varying requirements of medically needy persons. See H.R.Rep. No. 97–208, p. 971 (1981). Thus, as part of the Omnibus Budget Reconciliation Act of 1981 (OBRA), 95 Stat. 357, Congress amended the Medicaid Act by deleting the "comparability" requirement. After the amendment, a State was required only to include in its plan for the medically needy "a description of ... the criteria for determining eligibility of individuals ... for medical assistance." OBRA § 2171(a)(3)(C)(1), 95 Stat. 807.

The Secretary interpreted OBRA to authorize States to use income and resource criteria for medically needy different from those for categorically needy individuals:

"States are no longer required to apply a uniform methodology for treating income and resources in such matters as deemed income, interest, court-ordered support payments, and infrequent and irregular income. Rather, the State plan must specify the methodology that will be used, and that methodology must be reasonable." 46 Fed.Reg. 47980 (1981).

The regulations promulgated by the Secretary accordingly left the States free to use eligibility standards that were unrelated to the standards used in AFDC or SSI, as long as the standards were "reasonable." The Secretary's regulations did not address treatment of excess income for the medically needy or the calculation of spenddowns.

\*     \*     \*     \*     \*     \*

Congress disagreed with the Secretary's interpretation. See, *e.g.,* 127 Cong.Rec. 23363 (remarks of Rep. Waxman). This disagreement led to the enactment of the "same methodology" proviso, as part of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), § 137(a)(8), 96 Stat. 378. The House Report explained that TEFRA "makes clear that the Department [of Health and Human Services] had no authority to alter the rules that applied before September 30, 1981, with respect to medically needy income levels, *medically needy resource standards, and the methodology for treating medically needy income and resources.*" H.R.Rep. No. 97–757, pt. 1, p. 13 (1982). The House Report further explained that TEFRA reaffirmed "the

financial requirements previously in effect for the medically needy." *Ibid.*

Thus, the "same methodology" proviso ... operated solely to invalidate the post-OBRA regulations permitting the income and resource standards in state Medicaid plans to deviate from those used in the AFDC and SSI programs in "such matters as deemed income, interest, court-ordered support payments, and infrequent and irregular income." See 46 Fed.Reg. 47980 (1981). Treatment of excess income and the calculation of spenddowns were left untouched by the "same methodology" proviso.*

---

\* ... In the Deficit Reduction Act of 1984, § 2373(c)(1), 98 Stat. 1112, Congress amended § 1396(a)(17) to impose a moratorium on disapproving state Medicaid plans that might be inconsistent with the "same methodology" requirement. In doing so, Congress reaffirmed that its sole intent in enacting the "same methodology" requirement had been to invalidate the Secretary's 1981 regulations. See H.R.Rep. No. 98-861, pp. 1366-1367 (1984).

*Atkins,* 477 U.S. at 163-166, 106 S.Ct. at 2461-2463 (footnotes 7-9 omitted) (*emphasis added*). *Atkins* involved the "calculation of the spenddown," the difference between a medically needy applicant's income and the amount of medical expenses the applicant must incur to qualify for Medicaid, whereas the present case concerns the methodology for determining the resources of medically needy individuals.

Therefore, the issue before the court is controlled by the "same methodology" proviso found in title 42 United States Code, section 1396a(a)(10)(C)(1)(III).

**B.** *The SSI Methodology and the State Methodology*

The methodology for determining the eligibility of *categorically* needy individuals is prescribed by part A of subchapter XVI

of the Social Security Act [SSA], which establishes the maximum income and resource levels of blind, aged, or disabled individuals eligible for SSI. 42 U.S.C. § 1382 (1982 & Supp. III 1985). Section 1382b(a) specifies certain assets which may be excluded in the calculation of resources. An individual's home and automobile, for examples, may be excluded in determining SSI eligibility, to the extent that their values do not exceed the amounts determined reasonable by the Secretary. 42 U.S.C. § 1382b(a)(1) & (2)(A) (1982 & Supp. III 1985). The accompanying regulations define *resources* as:

cash or other liquid assets or any real or personal property that an individual (or spouse, if any) owns and could convert to cash to be used for his support and maintenance. If the individual has the right, authority or *power to liquidate* the property, or his share of the property, it is considered a resource. *If a property right cannot be liquidated, the property will not be considered a resource of the individual* (or spouse).

20 C.F.R. § 416.1201 (1987) (*emphasis added*).

Neither the statute nor any regulation more specifically addresses whether property is to be treated as a resource when its owner has made a bona-fide, but unsuccessful, effort to sell. However, in a section entitled "Other Limitations Which Restrict an Individual's Power or Right to Dispose of Real Property Resources," the Secretary's operations manual provides:

Occasionally, the claimant cannot liquidate a property right because of legal technicalities, general economic conditions in the community, or the inability to find a buyer. When a bona fide effort is made to dispose of a resource and evidence shows there is not a current market for the resource, then the resource will not be counted.

**A. Bona Fide Effort to Sell**

A bona fide effort to sell property exists where the evidence establishes that:

1. two different types of knowledgeable sources in the geographic area agree that the property is not salable due to a specified condition, *or*

2. an actual sale attempt (at a price not more than the highest CMV estimate obtained from a knowledgeable source) was made in the geographic area within 6 months of application or since the last determination of SSI eligibility, *and*

3. no offer to purchase is received.

SSI Program Operation Manual System [POMS] § 01130.330.

The State of Maine MPAPM provides a *resource* exclusion for:

7. Real property listed for sale which meets one of the following conditions:

a. a bonafide (sic) attempt at a fair market value was made in the geographic area within 6 months of the application or since the last review and no offer was received,

**OR**

b. two different knowledgeable sources in the geographic area agree that the property is not saleable due to a specified condition.

MPAPM, ch. III, Aid to Aged, Blind, and Disabled, State Supp. to SSI, at 7b (Rev. 8/83).

These two administrative procedures for determining the excludability of property from treatment as a "resource" on the ground that a bona-fide effort to sell has been made were significantly different before the advent of the Desmarais Memo-

randum.[3] There is a significant difference between an actual sale attempt and a listing for sale and between listing for sale at "a fair market value" and an actual attempt to sell at "the highest CMV [*current market value*] estimate obtained from a knowledgeable source." Moreover, there may well be a real practical difference between "two different knowledgeable sources" and "two different types of knowledgeable sources".

**C. *The Intent and Effect of the Desmarais Memorandum***

The Secretary asserts that the Desmarais Memorandum "does not foreclose the State from finding that the plaintiffs do not have the right, power, or authority to liquidate the property and therefore the property or property rights are not resources." Secretary's Memo, at 5. Inasmuch as this feature of the bona-fide-effort-to-sell policy presupposes the absence of any right, power or authority to dispose of the property, the Secretary contends that the Desmarais Memorandum does not require or counsel elimination of the long-standing federal bona-fide-effort-to-sell policy in its legitimate form.

Additionally, the Secretary insists that the Desmarais Memorandum was intended merely to correct the *misconception* that the bona-fide-effort-to-sell policy permitted a *blanket* exclusion of an asset from treatment as a resource simply because it could not be sold at the original asking price. Although the Desmarais Memorandum is no model of clarity, its second paragraph seems clear enough.

As such, any State policy which extends Medicaid eligibility on the basis of a "bona (sic) effort to sell" policy which provides for a *blanket* exclusion from resources of an asset which is not salable

---

**3.** The court cannot accept the Commissioner's assertion that, "[a]lthough worded differently, Maine's definition of bona fide effort to sell ... does not differ in substance from the POMS provision," Commissioner's Memo, at 6, unless it is conceded that the two procedures could lead to significantly different results in actual practice.

at the *asking* price or *original* current market value would be more liberal than SSI policy. (*Emphasis added.*)

The Desmarais Memorandum goes on to say:

> In other words, Medicaid eligibility can no longer be extended to individuals who have *excess* resources and who are making a bona fide effort to sell. Medicaid eligibility based on "bona fide effort to sell" does not exist. Individuals who have *excess* resources are ineligible for Medicaid. (*Emphasis added.*)

In isolation the second sentence of this portion of the Desmarais Memorandum can be read to say that there is no bona-fide-effort-to-sell policy for determining resource availability for Medicaid eligibility purposes. Like any other writing, however, the Desmarais Memorandum fairly cannot be read out of context or in isolation.

The Secretary reasonably asserts that the states remain free, under the Desmarais Memorandum, to exclude an asset from treatment as a "resource" for purposes of Medicaid eligibility, in two circumstances: (1) where the property is shown to be unsaleable due to a specific condition; or (2) where there has been an actual, unsuccessful attempt to sell the property at its current fair market value as determined by a knowledgeable source. However, there is no blanket exclusion of an asset from treatment as a resource merely because it does not command a purchase offer equal to its current fair market value.

Neither the statute nor any regulation specifically establishes a bona-fide-effort-to-sell exclusion. But it is the very essence of the concept of *resource availability* for Medicaid purposes, *see* 42 U.S.C. § 1396a(a)(17)(B) (1982), that the property be susceptible of conversion to cash, *see* 20 C.F.R. § 416.1201 (1987) (quoted *supra*, at 11). The Secretary's operations manual therefore provides that where market forces establish that there is *no* current market for the property it may be excluded from treatment as a "resource."

■ Thus, the Secretary's position is that there can be no *blanket* exclusion of property from treatment as a "resource" unless there is no current market for the property at *any* price, based on a bona-fide effort to sell as defined by the POMS. If there is an offer to purchase at less than the current fair market value, the property is treated as a "resource" to the extent of the offer.

The Secretary's interpretation being reasonable, it is entitled to deference. *Commonwealth of Mass. Dep't of Educ.*, 837 F.2d at 541; *Hogan*, 769 F.2d at 897.

### D. *The DEFRA Moratorium*

■ Thus, the important difference between the Secretary's bona-fide-effort-to-sell policy and the former Maine policy is that the Secretary explicitly requires an actual attempt to sell which "shows that there is not a current market for the resources," Secretary's Memo, at 11; whereas the practice of the defendant Commissioner prior to the Desmarais Memorandum was to exclude *entirely* from treatment as a resource property for which an "unreasonably low" offer to purchase had been received. Plainly, the latter practice was more liberal than the Secretary's bona-fide-effort-to-sell policy. In promulgating a more liberal procedure, the Commissioner contravened the "same methodology" requirement of section 1396a(a)(10)(C)(1)(III).

The plaintiffs argue that yet another statute precluded the Secretary from compelling the Commissioner to adopt the federal "actual sale attempt" requirement or to treat the amount of an unreasonably low offer for property as the value of the resource available to a Medicaid applicant. Section 2373(b)(21) of the Deficit Reduction Act of 1984, Pub.L. No. 98–369, 98 Stat. 494, 1112 (1984) (DEFRA), states:

The Secretary of Health and Human Services shall not take any compliance, disallowance, penalty, or other regulatory action against a State [for at least 18 months beginning July 18, 1984] by reason of such State's plan under title XIX of the Social Security Act being determined to be in violation of [42 U.S.C. § 1396a(a)(10)(C)(1)(III) ] on account of such plan's having a standard or methodology which the Secretary interprets as being less restrictive than the standard or methodology required under such section.

The Desmarais Memorandum was received by state officials in early June of 1985. Thus, the Desmarais Memorandum was issued during the DEFRA moratorium period.

The courts which have considered the DEFRA moratorium have reached contrary conclusions. The two cases which have held that the Secretary had violated the DEFRA moratorium involved actual disapprovals of amendments to state plans. *See State of Washington v. Bowen*, 815 F.2d 549, 555–56 (9th Cir.1987); *Cubanski v. Heckler*, 781 F.2d 1421, 1429 (9th Cir.1986), *vacated sub nom, Bowen v. Kizer*, — U.S. ——, 108 S.Ct. 1200, 99 L.Ed.2d 402 (1988) (Supreme Court vacated and remanded to Ninth Circuit, with instructions to dismiss, as Congress had enacted special legislation mooting controversy).

In *Cubanski*, four judges dissented from a rejection of a request for rehearing *en banc, see Cubanski v. Heckler*, 794 F.2d 540, 544–45 (9th Cir.1986), on the ground that DEFRA was inapplicable because the state plan amendment related to the permissible amount of a medically needy family's income, rather than to the methodology for determining whether property was to be treated as a resource. *Id.* at 546.

A Second Circuit panel indicated a disinclination to enforce the moratorium. *Camacho v. Perales*, 786 F.2d 32 (2d Cir. 1986).

The moratorium does not repeal [the same methodology provision] or suspend its effectiveness except to forbid the Secretary from taking enforcement action. And although the Conference Report suggests that the states may after all be allowed to depart from the methodology of the related cash assistance program and fashion their own less restrictive methodologies for determining the Medicaid eligibility of the medically needy, nothing suggests that the states must do so. Nor is guidance provided for determining the extent to which a state will be permitted to deviate. Here, for example, the State argues that it should be permitted two deviations, one less restrictive and one more restrictive, because its overall methodology is less restrictive than the SSI methodology. The intervenors, in contrast, argue that each step of the methodology must be no more restrictive than the corresponding step of the SSI methodology.

Congress imposed the moratorium, which may last as long as 30 months, on the Secretary's actions to enforce TEFRA "until the Congress has an opportunity to study and legislate on the matter." H.R.Conf.Rep. No. 861, 98th Cong., 2d Sess. 1367, *reprinted in* 1984 U.S. Code Cong. & Ad. News 2055. Until Congress has passed new legislation amending or rescinding § 1396a(a)(10)(C)(1)(III), we will apply that section as it was enacted.

*Id.* at 42 (*dicta*).[4]

---

4. Only two other cases have addressed the DEFRA moratorium. The first is *Maine Ass'n of Interdependent Neighborhoods v. Petit*, 659 F.Supp. 1309, 1327 (D.Me.1987), where the Secretary's action predated the DEFRA moratorium. The other case was a Ninth Circuit case later withdrawn pending rehearing. *See State of California v. United States Department of Health & Human Services*, 833 F.2d 1319 (9th Cir.1987).

■] The Desmarais Memorandum, clarifying the Secretary's policy and directing its implementation by the states, did not violate the terms of the DEFRA moratorium. DEFRA merely proscribed "any compliance, disallowance, penalty, or other regulatory action against a State...."[5] The Secretary, by issuing the Desmarais Memorandum, cannot be considered as having taken "... any compliance, disallowance, penalty, or other regulatory action *against a State...*" DEFRA, *supra.* Rather, the defendant Commissioner, *sua sponte,* abolished the entire bona-fide-effort-to-sell policy, an action which went well beyond any direction contained in the Desmarais Memorandum. Had the Commissioner not acted, any ensuing compliance, disallowance, penalty or other regulatory *action against the State of Maine* might at least have come within the terms of the DEFRA moratorium on *regulatory action against a state.* But on the present facts and under the express language of the statute the court can find no violation of the DEFRA moratorium.

### E. *Administrative Procedures Act*

■] Plaintiffs further assert that the Desmarais Memorandum contravenes the Administrative Procedures Act [APA].

First, plaintiffs argue that the policy position set forth in the Desmarais Memorandum should be set aside by the court under 5 U.S.C. § 706(2)(A)–(D),[6] because it "debunks a fundamental tenet of Medicaid law," is based on "unsound reasoning," is "arbitrary, capricious, an abuse of discretion, constitutes clear error of law, exceeds the Secretary's authority and was promulgated without observance of procedure required by law." Plaintiffs' Memorandum in Support of Motion for Summary Judgment, at 25–27.

Plaintiffs vigorously challenge the position taken in the Desmarais Memorandum for the reason that it requires that the best purchase offer, *even if unreasonably low,* must be treated as the "resource" value of the property for Medicaid eligibility purposes. *Id.* Plaintiffs argue that the Secretary's bona-fide-effort-to-sell policy places

5. There is language in DEFRA's legislative history which *would suggest that the* Desmarais Memorandum may have contravened the DEFRA moratorium. A House–Senate Conference Agreement states that the conferees intended that:

during the moratorium, the Secretary not proceed with the imposition of any sanctions, *or otherwise suggest to the States* that they must use more restrictive cash assistance standards and methodologies in their medically needy ... programs.

H.R.Rep. No. 98–861, 98th Cong., 2d Sess., 130 Cong.Rec. 6741 (1984) U.S.Code Cong. & Admin. News 1984, p. 697 (*emphasis added*). However, where the language of a statute is unambiguous, the intent of the legislature is to be gleaned from the statutory language, without recourse to its legislative history. *Avery v. Secretary of Health & Human Services,* 762 F.2d 158, 163 (1st Cir.1985); *Ciampa v. Secretary of Health & Human Services,* 687 F.2d 518, 523–24 (1st Cir. 1982). Moreover, without a very clear congressional mandate the courts should be reluctant to conclude that the Secretary has been stripped of his traditional role in interpreting the provisions of Medicaid law and *advising* the participating states of his interpretation. Indeed, it

may well be for this very reason that the DEFRA moratorium itself is less sweeping in its terms than the language of the cited House Report.

6. Section 706 provides:
   Scope of review
   To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

   ....

   (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
   (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
   (B) contrary to constitutional right, power, privilege, or immunity;
   (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
   (D) without observance of procedure required by law....

Medicaid applicants in a Catch–22 situation since *sale* of an asset at an unreasonably low price would run afoul of the 'transfer of assets' restrictions. *See* 42 U.S.C. § 1382b(c).[7]

> If they accept an offer of purchase which is substantially below fair market value then they risk losing Medicaid benefits based upon the transfer of assets for less than fair market value provision. If they reject the offer as too low they stand to lose Medicaid because the offer will set the value of the resource under the bona fide effort to sell policy.

Plaintiffs' Memorandum in Support of Motion for Summary Judgment, at 26.

Plaintiffs overlook the complementary relationship between section 1382b and POMS section 01130.330. If plaintiffs were to accept an offer below fair market value, section 1382b(c)(3) would require that the resource be valued, for purposes of the 'transfer of assets' provision, at its fair market value (at the time of the sale) *less* the amount received in the sale. 42 U.S.C. § 1382b(c)(3), *quoted supra*, at note 8. On the other hand, if the plaintiffs were to reject the only offer received following a bona-fide effort to sell, the resource value would be the amount of that "unreasonably low" offer. *See* POMS § 01130.330, *supra*. *See also* Desmarais Memorandum, *supra*.

The court can discern neither inconsistency nor unfairness in these procedures; not so, however, as to plaintiffs' position. Of course, plaintiffs appropriately recognize that a purchase offer may be considered unreasonably low by the owner, even though it is the highest offer generated in the current marketplace. But then the plaintiffs impliedly urge upon the court the obvious *non sequitur* that an offer *too low to accept* is nevertheless *too high to be the value* of the resource for Medicaid purposes. Unfortunately, it is a rigorous rubric of human experience that the cake is gone once it has been eaten.

The position taken by the Secretary in the Desmarais Memorandum is in no sense arbitrary, capricious, in excess of authority, contrary to law, or in any other way unreasonable or improper.

■ The plaintiffs further claim that the Desmarais Memorandum has been promulgated in contravention of 5 U.S.C. § 553(b)(A) (1982),[8] in that the Secretary thereby adopted a substantive rule, without complying with the rulemaking procedures requiring notice and opportunity for comment. The Secretary simply denies plaintiffs' APA claim, but articulates no argument.

Agencies are required to observe the APA notice and comment procedures applicable to substantive rulemaking. "Substantive rules are those which effect a change in policy." *Powderly v. Schweiker*, 704 F.2d 1092, 1098 (9th Cir.1983), citing *Gosman v. United States*, 573 F.2d 31, 39, 215 Ct.Cl. 617 (1978). "Interpretative rules

---

**7.** Title 42 United States Code, section 1382b(c), provides:

> (c) Resources disposed of for less than fair market value
>
> (1) In determining the resources of an individual (and his *eligible spouse, if any*) there shall be included (but subject to the exclusions under subsection (a) of this section) any resource (or interest therein) owned by such individual or eligible spouse within the preceding 24 months if such individual or eligible spouse gave away or sold such resource or interest at less than fair market value of such resource or interest for the purpose of establishing eligibility for benefits or assistance under this chapter.
>
> (2) Any transaction described in paragraph (1) shall be presumed to have been for the purpose of establishing eligibility for benefits

or assistance under this chapter unless such individual or eligible spouse furnishes convincing evidence to establish that the transaction was exclusively for some other purpose.

> (3) For purposes of paragraph (1) the value of such a resource or interest shall be the fair market value of such resource or interest at the time it was sold or given away, less the amount of compensation received for such resource or interest, if any.

**8.** Section 553(b)(A) provides:

> General notice of proposed rule making shall be published in the Federal Register, ... this subsection does not apply—(A) to interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice....

5 U.S.C. § 553(b)(A).

are those which merely clarify or explain existing law." *Powderly*, 704 F.2d at 1098. Dr. Desmarais characterizes his memorandum as a clarification of existing policy. *See* Desmarais Memorandum, text *supra*, at 6. But it is for the court to determine whether the Desmarais Memorandum is a mere clarification or effected a substantive change in SSA policy. *Cubanski v. Heckler*, 781 F.2d 1421, 1426 (9th Cir.1986), *vacated on other grounds, Bowen v. Kizer*, — U.S. ——, 108 S.Ct. 1200, 99 L.Ed.2d 402 (1988).[9]

The Desmarais Memorandum does not have the force of law. *See Evelyn v. Schweiker*, 685 F.2d 351, 352 n. 5 (9th Cir.1982) (POMS guidelines do not have the force and effect of law). The Desmarais Memorandum interprets and clarifies an existing POMS provision so that the application of the POMS provision by the states would be brought into conformity with federal law. *See* SSR 83–30a, Social Security Reporting Service, Rulings, 1987 Supplementary Pamphlet, at 135 (no provision in SSA or regulations excludes asset from treatment as "resource" solely because it is not convertible into amount of cash *desired by seller*).

In *Knutzen v. Eben Ezer Lutheran Housing Center*, 815 F.2d 1343, 1351 (10th Cir.1987), plaintiffs argued that two HUD memoranda were substantive rules requiring notice in the Federal Register. The court held that "the memoranda merely reiterate[d] the statutory and regulatory rule ... and thus [did] not constitute a change in any rule or policy." *Id.* The court noted further

that HUD issued the memoranda for the purpose of correcting some misconceptions on the part of a few regional HUD offices. The national HUD policy was consistent throughout, although regional policies may have changed. These regional policies, however, do not reflect on the national policy and cannot be used to demonstrate that the national policy changed.

*Id.* at 1351, n. 7.

As in *Eben Ezer*, the fact that the State of Maine changed its policy in response to the Desmarais Memorandum does not demonstrate that the Desmarais Memorandum represented a change in the Secretary's policy. Like the memoranda in *Eben Ezer*, the Desmarais Memorandum was designed to disabuse state officials (such as the defendant Commissioner, *see* MPAPM, ch. III, Aid to Aged, Blind, and Disabled, State Supp. to SSI, at 7b (Rev. 8/83), text *supra*, at 12) of the misconception that the federal bona-fide-effort-to-sell policy permitted a *blanket* exclusion of excess resources.

9. In *Cubanski v. Heckler*, 781 F.2d 1421 (9th Cir.1986), the Ninth Circuit rejected the Secretary's claim that a certain provision of an HHS operations manual [ROM] was an interpretive guideline, holding instead that it effected a substantive law change. While recognizing that "agency office manuals generally do not prescribe legislative rules with binding effect," the court decided that "the ROM section at issue in this case is an exception." *Id.* at 1426. The ROM provision would have allowed the state to increase the medically needy income level [MNIL]—"the amount of income an individual or family may keep for non-medical needs and still be eligible for Medicaid," *Cubanski*, 781 F.2d at 1423. The California Department of Health Services, relying on the ROM provision, attempted to increase the MNIL in its state plan, and the Secretary rejected the proposed amendment. The Secretary tried to repudiate the ROM provision, arguing that it was an interpretive guideline lacking the force and effect of law. Four judges, dissenting from a decision to deny rehearing, criticized the majority decision: "The panel's opinion in this case is an exercise in judicial legislation.... the opinion gives birth to a sweeping new doctrine: that a federal court may endow an agency's internal operating manual with the force of law.... The opinion seriously blurs lines dividing regulations from other agency issuances." *Cubanski v. Heckler*, 794 F.2d 540, 540 (9th Cir.1986). On March 22, 1988, the Supreme Court vacated the *Cubanski* decision because the controversy had been mooted by the passage of special legislation retroactively declaring that the California amendment was valid as of the date of its proposal. *See* Omnibus Budget Reconciliation Act of 1987, Pub.L. 100–203, § 4106, 101 Stat. 1330 (1987).

The Desmarais Memorandum is an interpretative guideline within the meaning of 5 U.S.C. § 553(b)(A). *See* note 8 *supra.*

Therefore, plaintiffs' APA claims must fail.

### F. *Conditional Eligibility 20 C.F.R. §§ 416.1240, et seq.*

The conditional eligibility provisions of 20 C.F.R. §§ 416.1240, *et seq.* (1987) permit the "categorically needy," with excess resources, to receive SSI benefits contingent upon timely disposal of their excess resources within a prescribed grace period, *id.* § 416.1242. Applicants must sell their excess resources and reimburse SSI from the sale proceeds for SSI benefits received during the grace period.

Relying on the "same methodology" requirement of 42 U.S.C. § 1396a(a)(10)(C)(1), plaintiffs insist that these SSI conditional eligibility procedures must be extended to the medically needy. The Secretary's response is limited to the conclusion that the SSI conditional eligibility procedures are "uniquely suited to a program affording monthly cash benefits. [They have] no counterpart in the Medicaid program," Secretary's Memo, at 15–16.[10] The Secretary

must explain to the court how he arrived at his *conclusion* that the SSI conditional eligibility provisions have no place in the Medicaid program.

Accordingly, the Secretary shall supplement the record with the reasons underlying the determination not to avail "medically needy" persons of the conditional eligibility procedures available to the "categorically needy" under 20 C.F.R. §§ 416.1240, *et seq.* The plaintiffs and the defendant Commissioner shall be accorded an opportunity to respond.

### G. *Sovereign Immunity*

██ The Secretary moves to dismiss the complaint on the ground that the Maine Superior Court lacked jurisdiction of the Secretary under the doctrine of sovereign immunity and that the federal court therefore could not acquire jurisdiction upon removal. The identical claim already has been rejected by this court under the authority of *Kozera v. Spirito*, 723 F.2d 1003 (1st Cir.1983). *See Willey v. Ives*, Civ. No. 85–0295–B (D.Me. Dec. 23, 1985) (order denying motion to dismiss). The Secretary simply reiterates the contention without any acknowledgment of the earlier ruling in this

---

**10.** The Secretary does make other observations on this subject, but the court is at a loss to divine their purport.

A "bona fide effort to sell" is not a precondition of monthly benefit payment under the conditional payment provisions of the SSI portion of the Social Security Act or the regulations. At most, a "bona fide effort to sell" may constitute "good cause" for affording an individual an additional period of up to three months once the initial six month period has expired.

This provision is uniquely suited to a program affording monthly cash benefits. It has no counterpart in the Medicaid program. The Medicaid provisions of the Social Security Act do not allow a State to condition Medicaid eligibility on an agreement by an individual to repay benefits out of the sale of the individual's otherwise countable resources. *For a State to do so would appear to be contrary to the specific limitations in the Medicaid provisions of the Act a State's recovoring* (sic) *properly made medical assistance payments, as well as the limitations on a*

*State's ability to impose liens on the property of persons receiving medical assistance, under 42 U.S.C. § 1396p.*

Given the unique applicability of conditional eligibility to a program of periodic cash benefits, its inclusion in the Medicaid program for the Medically needy would not be required by either the comparability provisions of 42 U.S.C. § 1396a(17) or the same methodology provisions of 42 U.S.C. § 1396a(10).

Secretary's Memo, at 15–16 (emphasis added).

As the Second Circuit has observed, an understanding of this area of the law

requires a foray into statutory provisions and regulations of labyrinthine complexity.

As program after program has evolved, there has developed a degree of complexity in the Social Security Act and particularly the regulations which makes them almost unintelligible to the uninitiated.

*Friedman v. Berger*, 547 F.2d 724, 727 n. 7 (2d Cir.1976). Such "labyrinthine complexity" is not rendered more intelligible by the italicized language from the Secretary's memorandum.

very case that the issue is controlled by *Kozera.*

Accordingly, the motion to dismiss is *DENIED.*

### H. *Claims Against Commissioner*

#### 1. *Maine Administrative Procedures Act [MAPA] Claim*

Plaintiffs contend that the defendant Commissioner's attempt[11] to eliminate the bona-fide-effort-to-sell policy constituted an abuse of discretion and that it was arbitrary and capricious, hence violative of MAPA, 5 Me.Rev.Stat.Ann. § 11007(4)(C)(2), (4) & (6) (1964). MAPA authorizes the reversal or modification of decisions of the Commissioner "... if the administrative findings, inferences, conclusions or decisions are: ... (4) Affected by bias or error of law; ... or (6) Arbitrary or capricious or characterized by abuse of discretion." *Id.*

■ The Commissioner's attempt to eliminate the bona-fide-effort-to-sell policy in its entirety, rather than conform it to the Desmarais Memorandum, was contrary to law. Moreover, in the exercise of a sound discretion, at the very least the Commissioner should have requested a conformity hearing, *see* 42 U.S.C. § 1316 (1982 & Supp. 1985), sought declaratory relief, *see Smith v. Puett,* 506 F.Supp. 134, 146 (M.D.Tenn. 1980), or contacted the Secretary for a formal ruling as to the meaning of the Desmarais Memorandum, *see Rose v. Heintz,* 806 F.2d 389, 390–91 (2d Cir.1986) (state Medicaid officials should have sought formal HHS ruling on "policy clarification" which rendered 2,100 families ineligible for Medicaid benefits; informal telephone request for HHS interpretation held insufficient), before abolishing the policy in its entirety.

The failure of the Commissioner to interpret the Desmarais Memorandum according to its own terms and existing law constituted legal error, *see* MAPA, § 11007(4)(C)(4), and the failure to resort to any of the readily available means of obtaining a definitive interpretation of the Desmarais Memorandum constituted an abuse of discretion, *see id.* § 11007(4)(C)(6).

### I. *Sections 1983 and 1988*

Plaintiffs contend that the Commissioner's attempt to eliminate the bona-fide-effort-to-sell policy constituted a deprivation of rights and privileges secured by the Constitution and laws of the United States, which is amenable to redress under section 1983 and which entitles plaintiffs to an award of attorney fees under section 1988.

The Commissioner concedes that actual elimination of the bona-fide-effort-to-sell policy would contravene the Medicaid statute and regulations. Nevertheless, the Commissioner maintains that his attempted elimination of the bona-fide-effort-to-sell policy was mandated by the Desmarais Memorandum. Therefore, insists the Commissioner, it is the defendant Secretary who "should be made to bear the cost of any attorney's fees or other costs if this Court finds liability on the part of either Defendant." State Defendant's Memorandum in Support of Motion for Summary Judgment, at 15.

Plaintiffs shall be allowed 30 days within which to file a fee application, with a supporting memorandum addressing the "prevailing party" issue. The Commissioner and the Secretary may file objections to the application, with their opposing memoranda, not more than 30 days from the filing of the fee application.

Accordingly, the court denies the demand for a judicial declaration that the Secretary's bona-fide-effort-to-sell policy is contrary to law; and the court denies permanent injunctive relief against the enforce-

---

11. The Commissioner's attempt to eliminate the bona-fide-effort-to-sell policy never took effect, due to plaintiffs' successful efforts at obtaining injunctive relief. *Willey v. Petit,* Civ. No. 85–295–B (D.Me. Feb. 10, 1986) (order granting preliminary injunction).

ment of the Secretary's bona-fide-effort-to-sell policy. Plaintiffs' counsel shall submit an appropriate form of proposed order within ten days.

SO ORDERED.